**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**(Western Division)**

| | |
|---|---|
| THE MEDICAL CENTER AT ELIZABETH PLACE, LLC, <br> One Elizabeth Place <br> Dayton, OH 45408, <br><br> *Plaintiff*, <br><br> v. <br><br> MEDAMERICA HEALTH SYSTEMS CORPORATION, <br> 40 West Fourth Street, Suite 2100 <br> Dayton, OH 45402; <br><br> ATRIUM HEALTH SYSTEM, <br> 40 West Fourth Street, Suite 2103 <br> Dayton, OH 45402; <br><br> CATHOLIC HEALTH INITIATIVES, <br> 198 Inverness Drive West <br> Englewood, CO 80112; <br><br> SAMARITAN HEALTH PARTNERS, <br> 2222 Philadelphia Drive <br> Dayton, Ohio 45406; <br><br> UVMC, <br> 3130 N. County Road 25-A <br> Troy, OH 45373; <br><br> *and* <br><br> PREMIER HEALTH PARTNERS, <br> 40 West Fourth Street <br> Dayton, OH 45402 <br><br> *Defendants*. | Case No. |

## COMPLAINT

The Medical Center at Elizabeth Place, LLC ("the Medical Center"), by and through its attorneys, alleges:

**NATURE OF THE ACTION**

1.      The Medical Center brings this action under federal antitrust laws to recover damages for and stop an ongoing conspiracy perpetrated by Defendants that has restrained competition in the provision of general inpatient surgical services in the Dayton, Ohio area.

**PARTIES**

2.      The Medical Center is a limited liability company organized under the laws of Ohio.  The Medical Center operates a twenty-six bed acute-care hospital in Dayton, Ohio.  The state of the art medical and surgical services provided by the Medical Center include orthopedic, neurosurgical, ophthalmological, general surgical, internal medicine, urological, gastroenterological, pathological, family practice, podiatric and gynecological services.  The Medical Center is accredited by the Joint Commission on Accreditation of Healthcare Organizations, the leading private hospital accreditor, and certified by the U.S. Center for Medicare and Medicaid Services.

3.      The Medical Center, which is located inside the former St. Elizabeth's Hospital in Dayton, opened in 2006 with four operating suites and space to expand to at least fifty beds.  The Medical Center was started by local physicians and is still controlled by local physicians.  As a physician-owned hospital, the Medical Center emphasizes high quality, patient-focused care.

4.      Defendant Premier Health Partners ("Premier") is an Ohio not-for-profit corporation formed in 1995.  Premier exists because of a Joint Operating Agreement ("JOA") among Defendants Catholic Health Initiatives, MedAmerica Health Systems Corporation ("MedAmerica"), Atrium Health System ("Atrium") and UVMC. Through the JOA, Premier manages some but not all of the health care operations of its members.  The JOA in essence is a consolidation of income streams of those operations.

2

5.       Defendant Catholic Health Initiatives is a Colorado not-for-profit corporation registered to do business in Ohio.  Catholic Health Initiatives is one of four corporate members of Premier. Catholic Health Initiatives is the sole corporate member of Defendant Samaritan Health Partners ("SHP"), an Ohio not-for-profit corporation formed in 1983.  Catholic Health Initiatives wholly controls SHP.  SHP, in turn, is the parent of and operates Good Samaritan Hospital.  Good Samaritan Hospital is an acute-care hospital located at 2222 Philadelphia Drive, Dayton, Ohio 45406.  Good Samaritan Hospital provides health care services, including general inpatient surgical services.  For purposes of the conduct alleged in this Complaint,  SHP and Catholic Health Initiatives are one and the same and will be referred to hereinafter as CHI.

6.       CHI, through Good Samaritan Hospital, has participated in Premier by way of the JOA described above since approximately 1996 as a result of an assignment by Sisters of Charity Health Care, Inc. of its rights under the JOA to CHI.  Premier has admitted that portions of CHI are outside the scope of the JOA and thus not under the management or control of Premier.  CHI owns, controls and operates other for-profit and not-for–profit businesses through SHP including Samaritan Family Care, Samaritan North Surgery Center, and the Heart Institute of Dayton. Included among the entities controlled by SHP are physician practices and other entities owned in part by physicians affiliated with SHP.  Those physicians direct patients to the hospitals owned and operated by CHI, MedAmerica, Atrium and UVMC.

7.       CHI makes material independent decisions concerning its operations and the operations of SHP and Good Samaritan that are not managed by Premier.

8.       Defendant MedAmerica is an Ohio not-for-profit corporation.  MedAmerica is one of four corporate members of Premier. MedAmerica is a diversified enterprise, sponsoring health care and education services to patients, health delivery organizations and health care professionals.  MedAmerica owns, controls and operates Miami Valley Hospital, which is an acute-care hospital located at 1 Wyoming Street, Dayton, Ohio 45409 that provides health care

3

services, including general inpatient medical and surgical services. MedAmerica controls the operations of Miami Valley Hospital, and has participated in Premier by way of the JOA described above since the JOA's inception.

9. MedAmerica also owns, controls and operates other for-profit and not-for-profit subsidiaries, including Health Specialists of Dayton, Inc. n/k/a Premier Health Specialists, Inc. ("Health Specialists") a for-profit corporation organized under the laws of Ohio. Health Specialists is a large physician group comprising over sixty physicians in twenty-five specialty physician practices that directs patients to the hospitals owned and operated by CHI, MedAmerica, Atrium, and UVMC. MedAmerica also controls MVHE, Inc., which employs a network of primary care physicians that refer patients to Health Specialists and admit patients to Miami Valley Hospital.

10. Premier has admitted that portions of MedAmerica and Miami Valley Hospital are outside the scope of the JOA and thus not under the management or control of Premier. MedAmerica makes material independent decisions concerning its operation and the operations of Miami Valley Hospital that are not managed by Premier, including but not limited to the operation of Health Specialists and MVHE, Inc.

11. Defendant Atrium is an Ohio not-for-profit corporation formed in 1983 for the purpose of conducting activities that will promote health care in the Middletown area. Atrium was previously known as Middletown Regional Health System. Atrium is one of four corporate members of Premier. Atrium controls and operates Atrium Medical Center ("AMC") in Middletown, Ohio. AMC is a newly constructed 239 bed acute-care hospital located at One Medical Center Drive, Middletown, Ohio 45005 that provides health care services, including general inpatient medical and surgical services. Atrium joined the JOA sometime prior to January 1, 2005. Atrium, through AMC, participates in Premier by way of the JOA described above.

4

12.     Premier has admitted that portions of Atrium are outside the scope of the JOA and thus not under the management or control of Premier. Atrium makes material independent business decisions concerning its operations and the operations of AMC that are not managed by Premier. Those entities include Mid-Miami Healthcare Foundation; Mid-Miami Senior Health Services; and Partnership, EAP, Inc.

13.     Defendant UVMC was incorporated in 1997 as an Ohio not-for-profit corporation for the purpose of conducting activities that will promote health care in Miami County and surrounding area counties. UVMC controls and operates Upper Valley Medical Center ("Upper Valley"), an Ohio not-for-profit corporation in Troy, Ohio. Upper Valley is a 139 bed acute-care hospital located at 3130 N. County Rd. 25-A, Troy, Ohio 45373 that provides health care services, including general inpatient medical and surgical services. UVMC controls the operations of Upper Valley. UVMC and Upper Valley participate in Premier by way of the JOA described above. UVMC joined the JOA in 2007.

14.     UVMC also owns, controls and operates for-profit and not-for-profit subsidiaries including, but not limited to, Miami County Mental Health Center; Med-Terra, Inc.; Upper Valley Professional Corporation; and UVMC Nursing Care, Inc.

15.     Portions of UVMC are outside the scope of the JOA and thus not under the management or control of Premier. UVMC makes material independent business decisions concerning its operations and the operations of Upper Valley that are not managed by Premier.

16.     For purposes of this Complaint, the term "Hospital Defendants" shall refer to CHI, MedAmerica, Atrium and UVMC.

**JURISDICTION AND VENUE**

17.     The Medical Center brings this action to obtain injunctive relief and to recover damages, including for treble damages and reasonable attorney's fees and costs, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

19.     This Court has personal jurisdiction over Defendants because, among other things, Defendants engage in systematic and regular business in the United States, including in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this district.

20.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15, and 22 and 28 U.S.C. § 1391(c).

**INTERSTATE COMMERCE**

21.     The conduct challenged in this action affects interstate commerce at a level sufficient to invoke the subject matter of the federal antitrust laws.  For example, as part of their conspiracy, Defendants conspired to get companies headquartered outside the state of Ohio to boycott the Medical Center.  In addition, much of the Hospital Defendants' revenues come from sources located outside of their home state, including from the federal government through such programs as Medicare.

**RELEVANT PRODUCT MARKET:**
**GENERAL INPATIENT SURGICAL SERVICES**

22.     The relevant product market in which to analyze Defendants' conduct is general inpatient medical and surgical services.  This is a broad cluster of surgical services that entail an overnight stay in the hospital by the patient: orthopedic, neurosurgical, ophthalmological, general

surgical, internal medicine, urological, gastroenterological, pathological, family practice, podiatric and gynecological services.

23.     Acute-care hospitals are the primary and predominant suppliers of general in-patient medical and surgical services.

24.     Physician-owned specialty hospitals are acute-care hospitals that primarily perform surgical procedures and are partially or fully owned by physicians.

25.     General inpatient medical and surgical services exclude (1) services at hospitals that serve solely children, military personnel, or veterans; (2) services at outpatient facilities that do not require an overnight stay; and (3) sophisticated services known in the industry as "tertiary" services, such as open heart surgery and transplants.  Patients and managed care plan providers are unlikely to treat these services as economic substitutes or switch to them in sufficient magnitude so as to render unprofitable a small but significant and non-transitory price increase (*e.g.*, 5-10 percent) by a company controlling general inpatient surgical services.

## RELEVANT GEOGRAPHIC MARKET

26.     The relevant geographic market in which to analyze Defendants' conduct constitutes an area no larger than Montgomery County, Ohio and some portion of the immediate adjacent counties (the "Dayton area").

27.     The relevant geographic market does not include Cincinnati or Columbus, Ohio. Patients and managed care plan providers are unlikely to treat hospitals in Cincinnati and Columbus as economic substitutes or to switch to them in sufficient magnitude so as to render unprofitable a small but significant and non-transitory price increase by a company controlling general inpatient surgical services in the Dayton area.

28.     Patients seek to be admitted for general inpatient medical and surgical services close to where they live.  Of the patients who reside in the Dayton area, over 90 percent rely on hospitals in the area for general inpatient medical and surgical services.

29.     For geographic market definition purposes, a sufficient number of patients do not regard relatively distant hospitals (*e.g.*, those in the Cincinnati and Columbus areas) to be economic substitutes for conveniently located hospitals providing general inpatient medical and surgical services in the Dayton area.

30.     The Medical Center competes with the relevant market hospitals controlled by CHI, MedAmerica, UVMC, and Atrium.

### THE IMPORTANCE OF MANAGED CARE CONTRACTS

31.     The leading managed care plan providers in the Dayton area are Anthem Blue Cross and Blue Shield ("Anthem") and UnitedHealthcare.  Their plans cover over 60 percent of the individuals in the Dayton area covered by managed care plans.

32.     Managed care contracts between commercial insurers or claim administrators and hospitals provide insured patients with significant financial incentives to seek services from a hospital under contract with their insurer or employer (an "in-network provider").  These incentives include lower co-payments and avoidance of out-of-network fees.

33.     In order to become an "in-network provider," a hospital must enter into an agreement with the managed care plan provider that sets out the terms and conditions of that status, including but not limited to the price that the managed care plan provider will pay for services that the hospital provides to the plan's subscribers.  A hospital cannot be an "in-network provider" for a managed care plan provider without such a contract.

34.     A hospital's designation as an "in-network provider" also tends to steer commercially insured patients to that hospital. Employees covered by commercial insurance typically receive information from the insurer about which local hospitals have in-network status.

35.     When a hospital gains in-network status under a particular insurance plan, it therefore tends to experience an increase in the number of patients covered by that plan who seek services at that hospital.

36.     There is no viable alternative to compete for these consumers other than contracting to become an in-network provider under these plans; without such authorization, health care services provided to such a consumer would not be covered by the consumer's managed care plan, thus compelling the consumer to bear the full cost of the service, even though she had health care coverage for that type of service under her plan.

37.     Conversely, hospitals without such contracts, or "out-of-network providers," absent extraordinary circumstances, will not be used by covered individuals. As a result, out-of-network providers usually must rely more heavily on patients covered by government insurers such as Medicare, Medicaid, and the Veterans Administration. To serve the community and compete in their markets, hospitals need to secure in-network status with commercial insurers and claim administrators.

### THE HOSPITAL DEFENDANTS' RELATIONSHIP TO EACH OTHER AND PREMIER

38.     In the 1994/1995 time frame, MedAmerica and Sisters of Charity Health Care, Inc. began discussions of a merger between MedAmerica and SHP, which Sisters of Charity Health Care, Inc. owned at the time.

39.     The negotiations progressed far enough for those entities to notify the Federal Trade Commission ("FTC") of their intent to merge. The FTC opened an investigation of the proposed merger and expressed preliminary concerns over the anticompetitive effect the merger might have on competition in the Dayton area.

40.     On June 9, 1995, while the FTC's investigation of the proposed merger was pending, MedAmerica and Sisters of Charity Health Care, Inc. entered into a JOA.

41.     The reported reason for abandoning a merger framework in favor of the JOA was that SHP was a "Catholic institution" and thus could not merge assets.

42.     Whatever the reason, the switch to the JOA shielded the transaction from traditional antitrust merger scrutiny.

43.     In 1996, Sisters of Charity Health Care, Inc. assigned its rights under the JOA to Defendant Catholic Health Initiatives, and Catholic Health Initiatives took control of SHP.

44.     In early 1996, shortly after the JOA formed Premier, the Miami Valley Employers Health Action Council estimated that the Premier members represented 52 percent of the inpatient admissions and 68 percent of the total hospital revenues in a four-county area encompassing Dayton.

45.     In January 2005, MedAmerica and CHI, competitors of Atrium at the time, committed to pay Atrium $80 million to join the JOA. The payment was earmarked to cover a majority of the construction costs of a replacement hospital for Atrium.

46.     According to published reports, Atrium emphasized the transaction was not a sale of assets or merger of staffs. If the structure of the transaction had been a merger, the transaction would have been reportable to the FTC and subject to antitrust review for possible

anticompetitive effects.  Because the transaction was structured as an expansion of the JOA, it avoided merger review by federal regulators.

47.     In 2008, MedAmerica, CHI and Atrium, competitors of the UVMC at the time, effectively paid UVMC $50 million to join the JOA.  The payment created a fund that was earmarked for future capital investments related to UVMC operations in Miami County, Ohio. The transaction also was not subject to federal antitrust merger review, even though prior to UVMC joining the JOA, Premier was reported to control a 55 percent share of the market through the aggregate shares of its members.

48.     Under the JOA, the Hospital Defendants are owned, controlled and operated independently but have agreed to operate certain aspects of their respective hospitals collaboratively.  Atrium has described the arrangement as one consisting of "separate healthcare systems" operating under the "guidance of Premier Health Partners."

49.     Although the Hospital Defendants share some functions under the JOA, they remain separate entities and independent centers of decision making for antitrust purposes with respect to the conduct being challenged in this Complaint.

50.     Premier has stated that the JOA is not a merger of assets, but a consolidation of revenue streams.  The focus of the Hospital Defendants' efforts through Premier is to collaborate on the basis of what Premier calls a "net income stream merger" in order to grow the market share of the Hospital Defendants because increased volume equals greater returns for each of them.

51.     A review of Premier's federal tax filings that are publicly available (2007, 2008 and 2009) shows that Premier has had no assets, no liabilities, no revenue, no income and no expenses since its creation in 1995.

52.    MedAmerica stated in its 2005 Federal Form 990:

MedAmerica Health Systems Corporation (MedAmerica), Catholic Health Initiatives (CHI) and Atrium Regional Health Care System (Atrium), all IRC Section 501(c)(3) organizations, have agreed to jointly operate **separate health care systems** pursuant to the terms of a joint operating agreement.  The joint operation is performed through Premier Health Partners, an Ohio non-profit corporation.  Under the guidance of Premier Health Partners, MedAmerica operates Miami Valley Hospital, CHI through its tax exempt subsidiary Samaritan Health Partners, operates Good Samaritan Hospital and Atrium operates Atrium Regional Hospital.

(emphasis supplied).

53.    Consistent with that statement, when MedAmerica issued $100 million in revenue bonds in 2011, MedAmerica disclosed in its bond offering memorandum that the bond proceeds were solely for the benefit of Miami Valley Hospital, and that only MedAmerica and Miami Valley Hospital would be obligated under the bonds.

54.    That memorandum also disclosed that "the consolidation of operations accomplished by the JOA did not constitute a merger.  Both the [Miami Valley] Hospital  and the other parties to the JOA continue to own their respective assets and to remain liable for their respective liabilities including long-term debt."

55.    According to available public filings, none of the Hospital Defendants has any ownership interest in one another.

56.    CHI's Consolidated Financial Statements for the fiscal year ending June 30, 2011 note that "CHI participates in JOAs with hospital-based organizations in five separate market areas," including the JOA managed by Premier.  CHI explains that "CHI retains ownership of the assets, liabilities, equity, revenues and expenses of the CHI facilities that participate in the JOAs."

12

57.     The remaining Hospital Defendants similarly maintain independent ownership of, and responsibilities for their respective assets, liabilities, equity, revenues and expenses.

58.     Each of the Hospital Defendants maintains a separate governing board under Ohio law who exercise authority for all business operations and decisions.

59.     Notwithstanding the joint management of some aspects of their respective hospital businesses, the Hospital Defendants remain actual and potential competitors in the relevant markets.

60.     It is plausible to conclude, and the Medical Center alleges, that participation in the JOA is not essential to the Hospital Defendants' individual participation in the relevant market.

61.     It is plausible to conclude, and the Medical Center alleges, that each one of the Hospital Defendants, as a signatory to the JOA, has expressly authorized Premier to act on its behalf regarding a variety of aspects of its general inpatient medical and surgical services business, including its interaction with managed care plan providers.

62.     Premier is the instrumentality through which the Hospital Defendants conduct the vast majority of their ongoing conspiracy.  With respect to all of the allegations regarding actions that Premier has taken, the Hospital Defendants knew or should have known of Premier's conduct.

63.     The Hospital Defendants' aggregate market share of general inpatient surgical services in the relevant geographic market exceeds 55 percent, whether measured by capacity, units of services, or revenues.

64.     According to public statements by MedAmerica in 2008, the aggregate share of the Defendant Hospitals is approximately 50 percent bigger than the next largest competitor in the market.

65.    This dominant and growing market share provides a reasonable basis to infer, and the Medical Center alleges, that the Defendant Hospitals in the aggregate have market power in the relevant markets.

66.    In addition, the collective power of the Hospital Defendants in the form of beds and provision of general inpatient medical and surgical services makes the Hospital Defendants a "must-have" trading partner for managed care plan providers in the relevant geographic market. A managed care plan cannot offer sufficient coverage to its enrollees in the relevant geographic market without the Hospital Defendants. This must-have trading partner status gives Premier the power to control prices and exclude competitors.

### DEFENDANTS' ANTITRUST CONSPIRACY

67.    Defendants perceive physician-owned specialty hospitals as a competitive threat. Federal government studies have confirmed that physician-owned hospitals have fewer medical errors, shorter turnover times, fewer infections and greater cost efficiencies in comparison to general acute care hospitals.

68.    According to a Premier Vice President, the Hospital Defendants believe that they "should preclude [specialty hospitals] in most cases." This is because the Hospital Defendants have believed and continue to believe that physician-owned specialty hospitals are "particularly damaging" because they "attract away an important segment of an existing hospital's admitting specialists" which has resulted in declines in revenues for the Hospital Defendants. The Hospital Defendants have conducted their conspiracy to attack the "significant competitive challenges" presented by specialty hospitals and to avoid a "dramatic decline in net revenues that [would] not [be] proportionate to the number of patient admissions or patient days lost." As a result of these beliefs and concerns, the Hospital Defendants set out on a course of action which Premier admits is designed to destroy the Medical Center and any other specialty hospital and eliminate them as competitive threats.

69. The Hospital Defendants agreed to take concerted action against physician-owned specialty hospitals in the Dayton area, and Premier presented the Hospital Defendants with the perfect vehicle with which to drive their antitrust conspiracy.

70. Among the first targets of the conspiracy was Dayton Heart Hospital. Premier brazenly acknowledged that the Hospital Defendants exerted their market power to convince managed care plan providers not to do business with Dayton Heart. As a result of the Hospital Defendants' conspiracy, Dayton Heart sold out to CHI in March 2008 and exited the market. Further, the physician owners of Dayton Heart were eligible for their share of the sales proceeds only if they agreed not to compete with the Hospital Defendants for a period of five years.

71. After the Hospital Defendants vanquished Dayton Heart, the Medical Center became the only remaining specialty hospital and thus the sole focal point of the conspiracy.

72. In furtherance of this conspiracy, the Hospital Defendants, through Premier, committed at least the following overt acts directed at the Medical Center:

(a) coercing, compelling or co-opting commercial health insurers or managed care plan providers, including Anthem, UnitedHealthcare, Private Healthcare Systems, Humana, Cigna, and Medical Mutual of Ohio to refuse to permit the Medical Center access to their respective networks;

(b) threatening punitive financial consequences to physicians who affiliated with the Medical Center and following through on punitive measures against physicians who did affiliate with the Medical Center;

(c) offering payments to physicians who agreed not to work with or at the Medical Center; and who agreed to divest ownership in the Medical Center;

(d)     coercing, compelling or co-opting physicians affiliated with or employed by the Hospital Defendants from becoming members of the Medical Center, admitting patients to the Medical Center, or referring patients to physicians who treated patients at the Medical Center;

(e)     hiring as employees key physicians affiliated with the Medical Center who accounted for a disproportionately high number of admissions and then prohibiting them from admitting patients to the Medical Center; and

(f)     coercing, compelling or co-opting commercial health insurers or managed care plans to provide reimbursement rates that were below market and below the rates and on different terms from what the Hospital Defendants demanded for the exact same services.

73.     The managed care plan providers involved in the overt acts identified above represent in excess of 70 percent of insured individuals in the Dayton area.

74.     With regard to admitting specialists and physicians, at least CHI, MedAmerica and UVMC have taken overt acts in furtherance of this conspiracy by inflating their network of employed physicians and specialists who are then prohibited from admitting patients to specialty hospitals or otherwise consulting with or aiding physicians who do so.   For example, MedAmerica controls Health Specialists and MVHE, Inc. which together includes over 100 employed physicians.   Health Specialists has more than doubled in size in the last two years alone.   It is plausible to assume, and the Medical Center alleges, that CHI, through Samaritan Family Practice and UVMC through Upper Valley Professional Corporation and UVPC Specialists operate their employed physician affiliates in a similar manner.

75.     These arrangements result in a physician alignment that results in a high acuity admissions that generate disproportionately high revenues per admission.   The Hospital

Defendants' non-compete provisions locks up a disproportionate percentage of this essential resource in the market.

76.     Defendants initiated and/or renewed these overt acts throughout the applicable limitations period in an ongoing effort to drive the Medical Center from the market.

77.     During 2008, in the midst of Defendants' conspiracy, Premier approached the Medical Center about the Hospital Defendants acquiring or otherwise absorbing the Medical Center.  The buyout would have eliminated the Medical Center as a competitive threat, just as the buyout of Dayton Heart eliminated that rival.  The Medical Center rejected the Hospital Defendants' overture through Premier.  Undeterred, Defendants continued with their conspiracy.

78.     As a result of the Hospital Defendants' conspiracy, and in an effort to mitigate its damages, in 2009 the Medical Center sold an ownership interest to Kettering Health Network ("Kettering"), the only other hospital system in the Dayton area, in exchange for Kettering's commitment to seek managed care contracts for the Medical Center on terms comparable to hospitals in the Kettering network.  Nevertheless, the Medical Center has continued to face restrictions regarding managed care contracts as a result of Defendants' ongoing conspiracy.

### DEFENDANTS' CONSPIRACY HAS CAUSED THE MEDICAL CENTER ANTITRUST INJURY

79.     Defendants' conduct constitutes a conspiracy among horizontal competitors that has obstructed competition, restricted entry and expansion in the relevant market, and caused harm to consumers.  This conspiracy has reduced output, price competition, and quality or service competition.

80.     As a result of Defendants' conduct, the Medical Center has been largely foreclosed from the relevant market.

81.     There is no legitimate pro-competitive justification for this conduct.  Participation in managed care plans does not guarantee a hospital care provider any portion of business, it simply makes the provider a viable option for the consumers covered by the managed care plan. Similarly, permitting physicians to admit patients at the Medical Center or to refer patients to physicians affiliated with the Medical Center does not guarantee any referrals or admissions.  It simply allows for patients and physicians to select the competitor most appropriate for the patients' care.  An arrangement between a group of competitors and a third party or buyer under which the third party agrees not to do business with a rival or to do business under terms that are less favorable than those that the group enjoys is the type of conduct that the antitrust laws were intended to prevent.

82.     Defendants' conspiracy was intended to – and did – exploit their aggregate market power in the relevant market.

83.     But for Defendants' conduct, managed care plan providers would have contracted with the Medical Center to be an authorized provider in their plans' networks, allowing the Medical Center to compete on the merits with other authorized health care providers, including the Hospital Defendants, for the consumers of general inpatient surgical services.

84.     Defendants' conduct caused injury to competition in the relevant markets.  For example, it denied consumers of general inpatient surgical services the ability to use the Medical Center under their health plans, thereby eliminating the Hospital Defendants' only competitor other than Kettering.  This materially constrained the Medical Center from exerting competitive pressure on the Hospital Defendants' pricing and quality.

85.     Thus, Defendants' conspiratorial conduct proximately caused injury to the Medical Center's business.

## COUNT I: VIOLATION OF SHERMAN ACT § 1

86.     The Medical Center repeats the allegations made in the preceding paragraphs as if fully set forth herein.

87.     Notwithstanding their shared functions under the JOA, the Hospital Defendants compete against one another in the relevant geographic and product markets and thus constitute distinct entities and horizontal competitors for the purposes of Section 1 of the Sherman Act, 15 U.S.C. § 1.

88.     The Hospital Defendants conspired to reduce output in the relevant markets, including by orchestrating group boycotts of the Medical Center.

89.     Through the JOA, the Hospital Defendants authorized Premier to take the steps necessary to implement this conspiracy on the collective behalf of the Hospital Defendants. Each of the Hospital Defendants knew that the others had so authorized Premier.

90.     Defendants took overt acts in furtherance of this conspiracy, some of which are identified in the preceding paragraphs.  These actions prevented and/or delayed the Medical Center's access to managed care contracts and thus foreclosed the Medical Center from a substantial segment of the relevant market or precluded that access on terms necessary for the Medical Center to compete.

91.     The conduct seeking to foreclose the Medical Center from access to managed care plans is not reasonably related to or necessary for Premier's performance of any of the joint functions specified under the JOA.

92.     The Hospital Defendants' conduct constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

93.     This horizontal conspiracy injured the Medical Center in its business in an amount to be determined at trial.  That injury is ongoing and will continue until and unless the conduct is stopped.

## PRAYER FOR RELIEF

WHEREFORE, the Medical Center prays for the following relief:

A.     The conspiracy and the acts done in furtherance thereof by Defendants be adjudged to have violated Sherman Act § 1, 15 U.S.C. § 1.

B.     Defendants be adjudged jointly and severally liable for all of the damages resulting from the illegal conduct described herein.

C.     Judgment be entered for the Medical Center against Defendants, individually and collectively, for three times the amount of damages sustained by the Medical Center, together with reasonable attorney's fees, prejudgment and post-judgment interest, and costs.

D.     The Court enter an injunction against Defendants sufficient to stop all conduct that forecloses the Medical Center from the relevant market or unreasonably impairs its ability to compete in the relevant market.

E.     The Medical Center obtain such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

The Medical Center demands a trial by jury.

DATED: January 30, 2012

/s/  James A. Dyer
James A. Dyer (Bar No. 0006824)
jdyer@ssdlaw.com
Toby K. Henderson (Bar No. 0071378)
thenderson@ssdlaw.com
SEBALY SHILLITO & DYER
A Legal Professional Association
1900 Kettering Tower
40 N. Main Street
Dayton, OH 45423-1013
Telephone:   (937) 222-2500
Facsimile:    (937) 222-6554

Richard A. Ripley (*pro hac vice* pending)
richard.ripley@haynesboone.com
James R. Wade (*pro hac vice* pending)
jim.wade@haynesboone.com
Nora L. Whitehead (*pro hac vice* pending)
nora.whitehead@haynesboone.com
HAYNES AND BOONE, LLP
1615 L Street, NW, Suite 800
Washington, DC 20036-5610
Telephone:   (202) 654-4500
Facsimile:    (202) 654-4245

Attorneys for Plaintiff
THE MEDICAL CENTER
AT ELIZABETH PLACE, LLC

1460811.1