UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MEDICAL CENTER AT ELIZABETH PLACE, LLC, | : | Case No. 3:12-cv-26 |
| Plaintiff, | : : : | |
| vs. | : : | Judge Timothy S. Black |
| PREMIER HEALTH PARTNERS, *et al.*, | : : | |
| Defendants. | : | |

**ORDER THAT DEFENDANTS' MOTION TO DISMISS (Doc. 22) IS DENIED**

This civil action is currently before the Court on Defendants'[1] motion to dismiss (Doc. 22) and the parties' responsive memoranda (Docs. 29, 30).[2] Defendants allege that Plaintiff's[3] Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim.

Specifically, Plaintiff alleges that the Hospital Defendants conspired through their shared managing agent, Premier, to orchestrate a per se illegal group boycott against it.

---

[1] Defendants include Premier Health Partners and its hospital affiliates: Atrium Health Systems, Catholic Health Initiatives ("CHI"), MedAmerica Health Systems, Samaritan Health Partners, and Upper Valley Medical Center ("UVMC") (collectively, "Hospital Defendants").

[2] Defendants request oral argument on this motion. (Doc. 30). The Court finds, however, that the pleadings are clear on their face and that oral argument is not necessary. *See* Local Rule 7.1(b)(2): "oral argument [will be granted] where deemed to be essential to the fair resolution of the case because of its public importance or the complexity of the factual or legal issues presented." *See also Whitescarver v. Sabin Robbins Paper Co.*, Case No. C-1-03-911, 2006 U.S. Dist. LEXIS 51524, at *7 (S.D. Ohio July 27, 2006) (C.J. Dlott) ("Local Rule 7.1(b)(2) leaves the Court with discretion whether to grant a request for oral argument.").

[3] Plaintiff is The Medical Center at Elizabeth Place ("MCEP").

Defendants' motion to dismiss relies on three arguments: (1) as a matter of law, Plaintiff's group boycott claim does not qualify for per se treatment; (2) Plaintiff has failed to allege an antitrust injury; and (3) Defendants are a single entity, and thus incapable of conspiring.

## I.   FACTS ALLEGED BY THE PLAINTIFF

For purposes of this motion to dismiss, the Court must: (1) view the complaint in the light most favorable to the Plaintiff; and (2) take all well-pleaded factual allegations as true. *Tackett v. M&G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009). Plaintiff <u>alleges</u> as follows:

MCEP opened in 2006 and operates a 26-bed physician-owned hospital in Dayton, Ohio. (Doc. 7 at ¶ 2). MCEP recently sold an ownership interest to Kettering Health Network ("Kettering"), a major competing hospital system in the area, in order to obtain access to Kettering's managed care contracts. (*Id.* at ¶¶ 63, 78). MCEP accounts for less than 4 percent of the general inpatient medical and surgical services market in the Dayton area. (*Id.* at ¶¶ 2, 62, 63).

MCEP's competitors for the provision of general surgical services included the hospitals owned by the Hospital Defendants. (Doc. 7 at ¶ 29). The Hospital Defendants view hospitals like MCEP as competitive threats because they "attract away an important segment" of surgical specialists, which results in revenue declines for the Hospital Defendants. (*Id.* at ¶ 68).

At the time MCEP began operating in the greater Dayton area, the Hospital Defendants had a collective market share of general inpatient surgical services that approached 55 percent. (Doc. 7 at ¶ 43, 46). In May 2006, CHI sent a letter to doctors who were considering an investment in MCEP, and in that letter CHI claimed incorrectly that MCEP violated federal and state law. (*Id*. at ¶ 67).

MCEP claims that Premier prohibited managed care plan providers, representing in excess of 70 percent of insured individuals in Dayton, from contracting with MCEP to service those subscribers. (Doc. 7 at ¶¶ 74, 75). Additionally, MCEP previously orchestrated a boycott by plan providers of Dayton Heart Hospital that forced Dayton Heart Hospital to sell out to CHI. (*Id.* at ¶¶ 72, 73). Even then, CHI, as part of the conspiracy against MCEP, conditioned the receipt of the sales proceeds by Dayton Heart's owners on a commitment by those doctors not to associate with MCEP if it began to offer competitive cardiac services. (*Id.* at ¶ 72).

In furtherance of this conspiracy, MCEP alleges that the Hospital Defendants, through Premier, committed at least the following overt acts directed at MCEP:

(a) coercing, compelling, co-opting or financially inducing commercial health insurers or managed care plan providers, including Anthem, UnitedHealthcare, Private Healthcare Systems, HealthSpan, Humana, Aetna, Cigna, and Medical Mutual of Ohio to refuse to permit MCEP full access to their respective networks;

(b) threatening punitive financial consequences to physicians who affiliated with MCEP and following through on punitive measures against physicians who did affiliate with MCEP, including terminating leases that the physicians had with the Defendants for office space;

    (c)    offering payments to physicians who agreed not to work with or at MCEP, and who agreed to divest ownership in MCEP;

    (d)    coercing, compelling, co-opting or financially inducing physicians affiliated with or employed by the Hospital Defendants from becoming members of MCEP, admitting patients to MCEP, or referring patients to physicians who treated patients at MCEP;

    (e)    hiring as employees key physicians affiliated with MCEP who accounted for a disproportionately high number of admissions and then prohibiting them from admitting patients to MCEP; and

    (f)    coercing, compelling, co-opting or financially inducing commercial health insurers or managed care plans to provide reimbursement rates that were below market and below the rates and on different terms from what the Hospital Defendants demanded for the exact same services.

(Doc. 7 at ¶ 74).

MedAmerica Health Systems and Sisters of Charity Health Care, Inc. formed Premier by entering into the JOA in 1995. (Doc. 7 at ¶ 39). MedAmerica is the parent of Miami Valley Hospital; in 1995, Sisters of Charity was the parent of Samaritan Health Partners (Good Samaritan Hospital's parent). (*Id.* at ¶¶ 4, 7). The two hospital systems had planned to merge, but they abandoned the merger in favor of the JOA because Good Samaritan Hospital could not merge its assets with a non-Catholic institution as a matter of Church principles. (*Id.* at ¶¶ 38-40). Sisters of Charity later assigned its JOA rights to Catholic Health Initiatives, which is now the parent of Samaritan Health Partners. (*Id.* at ¶¶ 4, 42). Atrium Health System (the parent of Atrium Medical Center) joined the JOA in 2005; UVMC (the parent of Upper Valley Medical Center) did so in 2008. (*Id.* at ¶¶ 44,

46). The Hospital Defendants are the sole corporate members of Premier. (*Id.* at ¶ 3).[4]

Premier, through the Hospital Defendants, operates the four hospitals. (*Id.* at ¶¶ 4-5, 7, 9-12, 14). Specifically, the Hospital Defendants collaboratively operate "certain aspects of" their hospitals through the JOA. (*Id.* at ¶¶ 47, 48, 51). The Hospital Defendants "share some functions" and "jointly operate separate health care systems." (*Id.* at ¶¶ 48, 51). Premier, in turn, supports the hospitals in their health care operations. (*Id.* at ¶ 3). For example, Premier manages the hospitals' relationships with managed care providers. (*Id.* at ¶ 60). The Hospital Defendants have also consolidated revenues through the JOA. (*Id.* at ¶¶ 3, 49).

MCEP alleges that the Hospital Defendants, acting through Premier, conspired to eliminate MCEP from the market. (*Id.* at ¶¶ 61,69, 73, 76). According to MCEP, Premier coerced managed care plan providers to refuse to permit MCEP access to those plans' networks or to reimburse MCEP at below market rates; Premier also allegedly induced physicians not to affiliate with MCEP. (*Id.* at ¶ 74). MCEP has been "prevented and/or delayed . . . access to managed care contracts" (*id.* at ¶ 90), and "has been largely foreclosed from the relevant market" (*id.* at ¶ 80).

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) operates to test the sufficiency of the

---

[4] A "member" of a not-for-profit entity is the equivalent of a shareholder of a for-profit company. Ohio Rev. Code §§ 1702.01(G), l702.04(B)(5), 1702.11, 1702.13. Therefore, if Premier were a for-profit company, the Hospital Defendants would be its only shareholders.

complaint.[5] Rule 12(b)(6) permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P 12(b)(6). The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The plaintiff's ground for relief must entail more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The first step in testing the sufficiency of the complaint is to identify any conclusory allegations. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a plaintiff's obligation to provide the grounds of [his] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Although the court must accept well-pleaded factual allegations of the complaint as true for purposes of a motion to dismiss, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

After assuming the veracity of all well-pleaded factual allegations, the second step is for the court to determine whether the complaint pleads "a claim to relief that is

---

[5] Traditionally, courts have held that a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is viewed with disfavor and is rarely granted. *Nuchols v. Berrong,* 141 Fed. Appx. 451, 453 (6th Cir. 2005).

plausible on its face." *Iqbal*, 129 S. Ct. at 1949, 1950 (citing *Twombly*, 550 U.S. at 556, 570). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949 (citing *Twombly*, 550 U.S. at 556).

### III. ANALYSIS

The Amended Complaint asserts a single per se violation of Section 1 of the Sherman Act. Section 1 outlaws "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To survive the motion to dismiss, Plaintiff must allege that: "(1) two or more entities engaged in a conspiracy, combination, or contract, (2) to effect a restraint or combination prohibited per se (wherein the anticompetitive effects within a relevant geographic and product market are implied), (3) that was the proximate cause of [MCEP's] antitrust injury." *Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 342-43 (6th Cir. 2006).

Defendants claim three separate and independent reasons require dismissal of the Amended Complaint: (1) Plaintiff's group boycott claim does not qualify for per se treatment; (2) Plaintiff failed to allege antitrust injury; and (3) Defendants are a single entity and thus incapable of conspiring. The Court will address each argument in turn.

#### A. Per Se Theory v. Rule of Reason

There are two modes of analysis for determining whether a challenged restraint

unreasonably restrains trade under Section 1 – the rule of reason and the per se rule.[6] The rule of reason is the prevailing standard of analysis and the per se rule is the exception, limited only to certain kinds of horizontal agreements[7] that are "plainly anticompetitive" and likely to have no "redeeming virtue." *Broad. Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 8, (1979).

The per se standard recognizes that there are some methods of restraint that are so inherently and facially anti-competitive that an elaborate and burdensome inquiry into a demonstrable economic impact on competition in a relevant market is not required. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). Under the per se analysis, "certain agreements or practices are so 'plainly anticompetitive,'. . . and so often 'lack . . . any redeeming virtue,'. . . that they are conclusively presumed illegal without further examination." *Broad. Must, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979). The decision to apply the per se rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to 'increase economic efficiency and render markets

---

[6] In evaluating whether Defendants unreasonably restrained trade, the Supreme Court has explained that "a restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates what has come to be known as the 'Rule of Reason.'" *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 457-58 (1986).

[7] Price fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are per se unlawful. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)

more, rather than less, competitive.'" *Id.* at 19-20.

Plaintiff claims that this is a per se antitrust claim because Defendants effectuated a "group boycott."[8] (Doc. 7 at ¶ 74). Defendants argue that the Amended Complaint contains no allegations, specific or general, about any individual act by the hospitals' alleged co-conspirators. The Court disagrees. The Amended Complaint alleges multiple overt acts by the co-conspirators: (1) CHI sent a letter to doctors who were considering an investment in MCEP stating that it was a violation of federal and state laws (Doc. 7 at ¶ 67); (2) CHI, MedAmerican, and UVMC expanded their network of employed physicians and specialists who are prohibited from admitting patients to specialty hospitals (*Id*. at ¶ 70); (3) Dayton Heart sold out to CHI in March 2008 and exited the market – the physician owners of Dayton Heart were eligible for their share of the proceeds if they

---

[8] "[There] is more confusion about the scope and operation of the per se rule against group boycotts than in reference to any other aspect of the per se doctrine." L. Sullivan, Law of Antitrust 229-230 (1977). Cases to which the Supreme Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Id.* at 261-62. In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete. *Silver v. New York Stock Exch.*, 373 U.S. 341 (1963). Additionally, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances, the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote. *Nw. Wholesale Stationers Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 294 (1985). A plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. However, under the auspices of a motion to dismiss, neither the Court nor the parties have the benefit of discovery and the Court must consider the alleged facts as true. The Court can imagine a scenario wherein a court determines that the per se rule applies, but discovery may later support a finding that rule of reason is in fact the appropriate standard of analysis.

agreed not to invest in MCEP (*Id.* at ¶ 72); (4) the Hospital Defendants coerced commercial health insurers or managed care plan providers, including Anthem, United Healthcare, Private Healthcare Systems, HealthSpan, Humana, Aetna, Cigna, and Medical Mutual of Ohio, to refuse MCEP full access to their respective networks (*Id.* at ¶ 74); (5) the Hospital Defendants threatened punitive financial consequences to physicians who affiliated with MCEP and followed through on punitive measures against physicians who did affiliate with MCEP, including terminating leases that the physicians had with the Defendants for office space (*Id.* at ¶ 74); (6) the Hospital Defendants offered payments to physicians who agreed not to work with or at MCEP (*Id.* at ¶ 74); (7) the Hospital Defendants coerced physicians affiliated with or employed by them from becoming members of MCEP, admitting patients to MCEP or referring patients to physicians who treated patients at MCEP (*Id.* at ¶ 74); (8) the Hospital Defendants hired physicians affiliated with MCEP who accounted for a disproportionately high number of admissions and then prohibited them from admitting patients to MCEP (*Id.* at ¶ 74); and (9) the Hospital Defendants coerced commercial health insurers or managed care plans to provide reimbursement rates that were below market and below the rates and on different terms from what they demanded for the exact same services (*Id.* at ¶ 74).  Additionally, in 2008, during the midst of the alleged conspiracy, Premier approached MCEP about the Hospital Defendants acquiring or otherwise

absorbing it. (*Id.* at ¶ 77).[9]

The Amended Complaint does not challenge the legality of the JOA, but rather the joint efforts by the Hospital Defendants to disadvantage a direct rival by coercing managed care plan providers to boycott MCEP. The fact that this joint conduct may have occurred within the guise of the JOA does not save it as a matter of law. Considering the facts in the light most favorable to the nonmoving party, the Amended Complaint alleges a naked restraint[10] consisting of conduct falling squarely within the category of boycotts and subject to per se treatment. (Doc. 7 at ¶ 91).

Courts have held that the per se rule applies to conduct taken under the mantle of a joint venture[11] when the challenged restraint is not reasonably related to any of the

---

[9] Although the alleged overt acts in furtherance of the conspiracy include vertical conduct (involving the alleged manipulation and coercion of managed care plan providers and physician), the multiplicity of actors as well as the effect of the agreement was predominately horizontal, and therefore per se illegal. *Com-Tel, Inc. v. Dukane Corp.*, 669 F.2d 404, 409 (6th Cir. 1982) ("[A]lthough the coercive pressure in this situation was applied vertically, we conclude that the stifling of competition in this instance was predominantly horizontal, warranting application of the per se rule of illegality as a group boycott.").

[10] A particular horizontal agreement is defined as a naked restraint "if it is formed with the objectively intended purpose or likely effect of increasing price or decreasing market wide output in the short run, with output measured by quantity or quality." *See* Hovenkamp Treatise P 1906a. If the Agreement is one that presents a "naked restraint of trade with no purpose except stifling competition," it qualifies for per se treatment. *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963). *See also* Hovenkamp Treatise P 1906a ("Once a restraint is classified as 'naked,' condemnation follows almost as a matter of course, most often without elaborate inquiry into power or actual effects and with only a several limited recognition of defenses.").

[11] The existence of shared functions and joint management, along with the pooling of capital and the consolidation of revenues is the very definition of a joint venture. *Texaco Inc. v. Dagher*, 547 U.S. 1, 3-4 (2006) (noting the competitors created an "economically integrated joint venture" by agreeing to consolidate their operations and "pool their resources and share the risks of and profits from [the venture's] activities"). Generally, the rule of reason and not the per se rule applies to the conduct of joint ventures and similar arrangements.

efficiency-enhancing benefits of a joint venture, and serves instead only as a naked restraint against competition. *See, e.g., Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210, 229 (D.C. Dir. 1986). Organizing a group boycott of MCEP does not promote any legitimate objective of the JOA or achieve any procompetitive benefits. When an alleged restraint bears no relationship to some procompetitive justification or legitimate function of the joint venture, the challenged restraint must be evaluated on its own and can be per se illegal even if the remainder of the joint venture is lawful. *Blackburn v. Sweeney*, 53 F.3d 825, 828-29 (7th Cir. 1995) (applying per se rule to a provision in a law partnership dissolution agreement that restrained the territories where former partners could advertise after finding the provision to be non-ancillary to the rest of the agreement).

Accordingly, based upon the facts before this Court, the per se theory applies. Plaintiff has sufficiently alleged the first two factors of the *Expert Masonry* test, and the Court will address the third factor *infra* at Section C.

**B.     Single Entity**

Conduct by a single entity is not covered by Section 1; rather, the statute applies only to joint conduct. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1983). Section 1 does not apply to unilateral conduct; it prohibits only certain agreements in restraint of trade. Here, Defendants argue that the Hospital Defendants, through Premier, are so integrated that they operate as a single entity whose conduct is beyond the scope of Section 1 of the Sherman Act.

While Plaintiff concedes some facts which indicate integration between Defendant Hospitals,[12] it also alleges facts that the Hospital Defendants are separate and distinct entities (Doc. 7 at ¶¶ 48, 87), and that they remain "actual and potential competitors in the relevant markets" (*id.* at ¶ 58). Specifically, Plaintiff alleges that: (1) the Hospital Defendants are "owned, controlled and operated independently" (Doc. 7 at ¶ 47); (2) one of the Hospital Defendants described the JOA as "separate healthcare systems" operating under the guidance of Premier (*Id.*); (3) it characterized the JOA as a "consolidation of revenue streams" (*Id.* at ¶ 49); (4) since its formation, Premier has reported no assets, no liabilities, no revenue, no income, and no expenses (*Id.* at ¶ 50); (5) each of the Hospital Defendants has maintained independent ownership of, and responsibilities for, their respective assets, liabilities, equity, revenues, and expenses (*Id.* at ¶¶ 52, 53, 55, 56); (6) each of the Hospital Defendants maintains separate governing boards under Ohio law that exercise authority for all business operations and decisions (*Id.* at ¶¶ 57); (7) each of the Hospital Defendants makes material independent decisions concerning their respective operations that are not managed by Premier (*Id.* at ¶¶ 6, 9, 11, 14); and (8) the Hospital Defendants remain actual and potential competitors in the relevant markets (*Id.* at ¶ 58).

---

[12] MCEP acknowledges that the Hospital Defendants "jointly operate separate health care systems" (Doc. 7 at ¶ 51) and that they "have agreed to operate certain aspects of their respective hospitals collaboratively" (*id.* at ¶ 47). MCEP further alleges that Premier acts for the hospitals (*id.* at ¶ 6) and that the Hospital Defendants have consolidated revenues through Premier (*id.* at ¶¶ 3, 49).

Accordingly, Plaintiff has alleged sufficient facts to maintain that the Hosptial Defendants are not a single entity. While the JOA might "refute" some of these allegations, that simply creates a facutal dispute. This Court cannot assume the JOA is being enforced as written.

Plaintiff cites *Healthamerica Penn. v. Susquehanna Health Sys.*, 278 F. Supp. 2d 423 (M.D. Pa. 2003), in support of its argument. In *Healthamerica*, which had a JOA similar to the one challenged here, two health care systems formed Susquehanna Regional Healthcare Alliance for the purpose of managing the delivery of healthcare services in central Pennsylvania. *Id.* at 426. The Court held that it was "readily apparent that defendants' actions [were] guided 'not by two separate corporate consciousness, but one.'" *Id.* at 435. However, *Healthamerica* was decided on a summary judgment motion and then only after extensive discovery had been conducted with respect to whether the hospitals and the alliance actually functioned as a single entity. Additionally, the health alliance in *Healthamerica* was subjected to considerable antitrust scrutiny at its formation. In fact, the Pennsylvania Attorney General's Office negotiated a consent decree with the parties which "authorized the formation of the Susquehanna Alliance in exchange for various conditions and restrictions on the new entity's operations and pricing." *Id.* at 427.

Defendants fail to point to any case where a court has decided this factually driven issue on a motion to dismiss.

### C. Antitrust Injury

Finally, in order to state a claim, Plaintiff must plead an antitrust injury. An antitrust

-14-

injury is an: (1) "injury of the type the antitrust laws were intended to prevent" and (2) injury "that flows from that which makes defendants' acts unlawful." "[B]ecause the purpose of the antitrust laws is to protect competition rather than competitors, a plaintiff must allege injury, not only to himself, but to a relevant market. Thus, failure to allege an anti-competitive impact on a relevant market amounts to a failure to allege an antitrust injury." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). "[A] plaintiff must put forth factual allegations plausibly suggesting that there has been an adverse effect on prices, output, or quality of goods in the relevant market as a result of the challenged actions." *Guinn v. Mount Carmel Health*, No. 2:09cv226, 2012 U.S. Dist. LEXIS 24353, at *4 (S.D. Ohio Feb. 27, 2012). Injury to the plaintiff alone does not satisfy the antitrust injury requirement: "the key inquiry is whether competition - not necessarily a competitor – suffered as a result of the challenged business practice." *CBC Companies v. Equifax, Inc.*, 561 F.3d 569, 571-72 (6th Cir. 2009).[13]

Plaintiff argues that "the adverse effect of competition is presumed" in per se cases. (Doc. 29 at 11-12). To the contrary, the caselaw notes that "[t]he 'mere presence' of a per se violation under Sherman Act § 1 . . . does not by itself bestow on any plaintiff a private right of action for damages." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443-44

---

[13] "[A]n antitrust plaintiff must show that (1) the alleged violation tended to reduce competition overall and (2) the plaintiff's injury was a consequence of the resulting diminished competition." *J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*, 485 F.3d 880, 887 (6th Cir. 2007). This requires a demonstration, "as a threshold matter, 'that the challenged action has had an actual adverse effect on competition as a whole in the relevant market.'" *George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 139 (2nd Cir. 1998).

(9th Cir. 1995). "[T]he per se rule is a method of determining whether § 1 of the Sherman Act has been violated," *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-42 (1989), but "it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Clayton Act." *Id.* "[T]he need for this showing [of antitrust injury] is at least as great under the per se rule as under the rule of reason. Indeed, insofar as the per se rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored." *Id.* at 343.

Plaintiff claims that the Amended Complaint "explicitly alleges that Dayton-area consumers have been forced to pay higher prices as a result of Defendants' conduct." (Doc. 29 at 13). Although, the words "higher prices" do not appear in the Amended Complaint, it does state that

> Defendants' conduct caused injury to competition in the relevant markets. For example, it denied consumers of general inpatient surgical services the ability to use the [MCEP] under their health plans, thereby eliminating the Hospital Defendants' only competitor other than Kettering. This materially constrained the [MCEP] from exerting competitive pressure on the Hospital Defendants' pricing and quality.

(*Id.* at ¶ 84). Additionally, the Amended Complaint maintains that Defendants' conduct actually "denied" Plaintiff "access to managed care plans," which alleges an injury to both Plaintiff and competition in general:

> In furtherance of this conspiracy, the Hospital Defendants, through Premier, committed at least the following overt acts directed at the Medical Center: . . coercing, compelling, co-opting or financially inducing commercial health insurers or managed care plans to provide

-16-

>reimbursement rates that were below market and below the rates and on different terms from what the Hospital Defendants demanded for the exact same services. The managed care plan providers involved in the overt acts identified above represent in excess of 70 percent of insured individuals in the Dayton are. As an example, in early 2008, Private Healthcare Systems advised the Medical Center that it attempted to get Defendant Premier to remove the exclusivity provision in the contract that Private Healthcare Systems had with the Hospital Defendants, but Premier refused. In 2009, Premier told HealthSpan that it would terminate the contract that Health Span had with the Hosptial Defendants if HealthSpan added the Medical Center to its Preferred Plan list of participating hospitals.

(Doc. 7 at ¶¶ 74, 75).

Plaintiff has set forth facts which allege that Defendants' violation reduced competition overall and injured Plaintiff. Thus, Plaintiff has alleged sufficient facts to state a claim for violation of Section 1 of the Sherman Act.

## IV.   CONCLUSION

Accordingly, based on the foregoing, Defendants' motion to dismiss (Doc. 22) is

**DENIED.**

   **IT IS SO ORDERED.**

Date:  8/30/12

                                               *s/ Timothy S. Black*
                                               Timothy S. Black
                                               United States District Judge