## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

THE MEDICAL CENTER AT ELIZABETH
PLACE, LLC,

       *Plaintiff,*

v.

PREMIER HEALTH PARTNERS, *et al.,*

       *Defendants.*

Case No. 3:12-cv-00026-TSB

Judge Timothy S. Black

Magistrate Judge Michael J. Newman

## COMBINED MEMORANDUM OF COMMUNITY INSURANCE COMPANY IN OPPOSITION TO MOTIONS TO COMPEL OF PLAINTIFF AND DEFENDANTS

## I.    PRELIMINARY STATEMENT

In response to grossly overbroad subpoenas from plaintiff and defendants, Community

Insurance Company ("CIC") has agreed to produce a series of documents that are directly

responsive to the very limited issue as to CIC raised in the Complaint. The parties, however, are

not satisfied with a reasonable and responsive production from a third party to this litigation.

Motivated by speculation and an apparent desire to discover the innermost secrets of an entity

with which they regularly negotiate contracts, plaintiff and defendants now move this Court to

compel CIC to produce a burdensome array of highly confidential documents that would, among

other things, disclose CIC's strategies in negotiating contracts with plaintiff and defendants.

CIC asks this Court to recognize its legitimate interest in maintaining the confidentiality

of information that goes to the core of its ability to compete in its business, protect CIC from

undue burdens that should not be borne by a third party to litigation, and deny the motions to

compel. As will be shown, the parties quite clearly have not made the showing necessary to

obtain competitively sensitive information from a third party through burdensome subpoenas.

## II.    FACTUAL BACKGROUND

### A.    The Lawsuit, The Subpoenas, And CIC's Proposed Production

The Amended Complaint describes CIC as a "leading managed care plan provider[] in the Dayton area." Am. Cmplt. ¶30, ECF No. 7. The only other allegation about CIC asserts that defendants engaged in an "overt act" that involved "coercing, compelling, co-opting or financially inducing commercial health insurers or managed care providers, including [CIC] . . . to refuse to permit the Medical Center full access to their respective networks." Id. ¶74(a).

Notwithstanding CIC's non-party status, both parties served broad subpoenas on CIC. Defendants' subpoena commanded CIC to produce 18 categories of documents covering a seven-year period, including contracts, "internal communications and deliberations," negotiation documents, and a wide range of claims data and other information – not only as to plaintiff, but also as to Kettering Health System ("Kettering") and other providers in the Dayton area. See Cert. of Charles Faruki Ex. A, ECF No. 60-1.[1] Plaintiff's subpoena included 17 "document specifications" covering a ten-year period and sought documents as to contracts and interactions with hospitals in Dayton and elsewhere in Ohio, CIC's internal discussions about contracting with plaintiff, "[a]ll documents evaluating, referencing, or concerning the cost of quality" of care provided by plaintiff or defendants, and "all documents concerning or relating to comparisons of the cost" of care in Dayton. See Decl. of Richard Ripley Ex. A, ECF No. 63-1 ("Ripley Decl.").

CIC made extensive written objections and CIC's counsel conferred with counsel for the parties to discuss CIC's objections and its response to the subpoena. See Faruki Cert. Exs. B, C; Ripley Decl. In May, counsel for CIC and the parties had a joint conference call to allow CIC to describe its unified approach to the subpoenas, and CIC then sent a letter to counsel for the

---

[1] In addition, defendants also served a Rule 30(b)(6) notice, to which CIC objected, that requested that CIC produce a corporate representative to testify to 13 different subject areas. See Faruki Cert. Ex. A, ECF No. 60-1.

parties setting forth CIC's position in writing. Faruki Cert. Ex. C. CIC's proposed response to the subpoenas was as follows:

> * CIC had preserved the electronic mailboxes of the three employees responsible for hospital contracting in the Dayton area from 2006 to 2009 and would search those e-mailboxes as well as the e-mailboxes of the two people responsible for hospital contracting in the Dayton area since 2009. CIC requested that the parties agree on one set of search terms to be applied to the five e-mailboxes.

> * CIC would produce its contracts with plaintiff and defendants from 2006 to the present, with all pricing terms redacted, subject to a modified protective order.

> * CIC would produce communications between CIC and MCEP about contracting from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above.

> * CIC would produce communications between CIC and MCEP about PHP and between CIC and PHP about MCEP from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above.

> * CIC would produce communications between CIC and Kettering about a contract with MCEP from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above.

> * CIC would produce, for the period 2006 to the present, a list and summary of each product it offered in the Dayton area and a list and summary of the number of its subscribers enrolled in each product, subject to a modified protective order.

> * CIC would produce non-confidential documents that set forth its policies, rules, and access standards for participation in CIC networks.

*Id.* CIC further stated that it would not voluntarily produce documents reflecting its internal deliberations and analyses, its contracts with other hospitals, or claims data. *Id.*

Rather than accepting CIC's proposal, plaintiff and defendants filed motions to compel.

**B.      The Highly Confidential Nature Of The Information Sought By The Subpoenas And The Enormous Burdens Imposed By The Subpoenas**

CIC provides health care insurance and related administrative services to employers and individuals. Decl. of Terry Frech ¶2 (attached as Ex. A). An extremely important part of the services it offers is access to a network of health care providers with which CIC has contracts.

*Id.* Those contracts govern how much ultimately will be paid to the provider for particular types of health care received by an individual covered by a CIC-insured or CIC-administered plan. *Id.*

There is intense competition among companies that offer health insurance and related services to individuals and businesses, and a key area of competition is cost. Frech Decl. ¶3. CIC's contracts with providers are crucial to its ability to be competitive. *Id.* ¶4. CIC must be able to negotiate contracts upon terms that allow it to offer insurance and administrative services at competitive rates that will appeal to cost-conscious consumers. *Id.* Accordingly, in every provider negotiation, CIC's ultimate objective is to obtain the provider's agreement to the best possible reimbursement rates while maintaining an adequate network. *Id.*

1.   *CIC's Paramount Interest In Confidentiality Of Provider Contracts And CIC's Negotiation Strategies And Related Data Analysis*

CIC's ability to effectively negotiate contracts is contingent upon keeping the terms and conditions of its contracts with providers strictly confidential. Frech Decl. ¶5. If a provider became aware of the terms of CIC's contract with a competing health care provider, the provider could use that information during negotiations to try to obtain a more lucrative contract. *Id.* If, as a result, CIC had to agree to reimburse providers at higher rates, it would increase the cost of insurance and administrative services to <u>all</u> individuals and businesses covered by CIC plans. *Id.* That result also would inevitably make CIC less competitive. *Id.*; *see also id.* ¶¶ 6-7.

For that reason, CIC considers its contracts to be highly confidential and proprietary and actively acts to protect their confidentiality. Frech Decl. ¶8. The contracts state that they are confidential and proprietary information and impose detailed confidentiality obligations upon all parties that survive the termination of the contracts. *Id.* The contracts are kept in a secure area and access is restricted to approved associates who must complete special training. *Id.* In the past CIC has acted, in litigation and otherwise, to maintain contract confidentiality. *Id.*

4

CIC maintains a small contract negotiation team to ensure confidentiality. Frech Decl. ¶9. The details of its contracting strategy and proposed contract language and rates are part of that team's work papers, which are kept in secure locations. *Id.* The team members are highly experienced and have shown their ability to maintain confidentiality in past negotiations. *Id.*

CIC views all materials and techniques it uses to analyze cost, quality, and treatment patterns, forecast future usage and cost trends, plan negotiation strategies, develop contract proposals, and analyze providers – among other non-public, contract-related activities – as strictly confidential, trade secret material. Frech Decl. ¶10. If such information became known to the providers with which CIC must negotiate contracts, they would have a road map to CIC's methods and goals that would put CIC at an impossible disadvantage in contract negotiations. *Id.* The result would be more lucrative contracts for providers and more expensive insurance and administrative services for CIC members and other individuals in the Dayton area. *Id.*

2.  *Special Concerns About Competitive Harm In The Dayton Area and Disclosure Of Confidential Materials To Plaintiff and Defendants*

The danger of significant competitive harm if CIC's confidential materials are disclosed is particularly acute in Dayton, where Premier Health Partners ("Premier") and the Kettering Memorial system ("Kettering") have made Dayton a virtual two-hospital marketplace. Frech Decl. ¶11. Premier is a defendant in this case, and Kettering holds a large ownership interest in the plaintiff. *Id.* As a result, any production of CIC's confidential contracting documents would be made to representatives of the two dominant hospital systems in the area, each of which is looking for a means to gain an advantage in their contracting negotiations with CIC. *Id.*

If Premier and Kettering were to obtain CIC's confidential information and use that information in contract negotiations, it would reduce pricing competition in the Dayton area and inevitably, and unnecessarily, increase health care costs. Frech Decl. ¶12. It also would cause

irreparable harm to CIC's ability to secure contracts that allow it to compete effectively in marketing health insurance and related services to consumers of those products. *Id.*

Significantly, those adverse consequences would be seen almost immediately, because negotiations with Premier are now underway. Frech Decl. ¶13. Premier sent CIC a formal notice of termination of the current contract, effective January 1, 2014, and CIC currently is awaiting a proposal from Premier toward a new contract. *Id.*

CIC's interest in maintaining confidentiality is further heightened by its past experiences with plaintiff and defendants. Frech Decl. ¶14. In 2005, CIC and Premier were unable to agree to a contract, the Premier hospitals became out-of-network facilities, and Premier brought dozens of lawsuits against CIC challenging payments of individual claims – lawsuits in which Premier was represented, in part, by the same firm representing Premier in this case. *Id.* More recently, the plaintiff also has threatened litigation against CIC. *Id.*

Furthermore, CIC has been advised that Premier has terminated its agreement with the company that had provided administrative services for Premier's employee health care plans and that Premier will be acting as its own third-party administrator for that plan. Frech Decl. ¶15. CIC understands that Premier has been working to build an Accountable Care Organization that would include a network of providers that would be marketed to Medicare-eligible individuals and is considering expanding its efforts to include insurance of risk. *Id.* Premier thus is akin to, and may directly become, a competitor to CIC in marketing insurance and related services. *Id.* ¶16. If Premier were to obtain confidential information about CIC's contracts and strategies with providers, it would provide Premier with an enormous, unfair competitive advantage. *Id.*

For all of these reasons, CIC considers its contracts, its analytical materials, its strategies, its deliberations about negotiations, and related materials to be extraordinarily confidential, trade

secret information, the disclosure of which could have an immediate, devastating impact on CIC's competitiveness, its ability to negotiate effectively with Premier, plaintiff, and Kettering, and the price of health insurance for everyone in the Dayton area. Frech Decl. ¶17.

3.    *The Inadequacy Of The Protective Order*

The protective order in this case does not provide adequate protection for the highly confidential materials sought by the subpoenas. Frech Decl. ¶23. Producing such documents to law firms, consulting and testifying experts, and others would greatly increase the number of people with access to the documents and thereby increase the risks of inadvertent disclosure. *Id.* Any trial would be open to the public and there would be no protection for any document that was introduced into evidence or made the subject of testimony. *Id.* Even if such disclosure did not occur until years into the future, CIC would endure harm to its competitive position if the terms of its contracts, and its negotiation strategies, became a matter of public record. *Id.*[2]

4.    *The Burdens Imposed By The Subpoenas*

The subpoenas have already imposed costs and burdens on CIC, through attorney fees and employee time. For example, CIC has spent 10 hours obtaining data for the three former employees and expects to spend another six hours collecting the email from the two current employees; the initial collection of emails from the three former employees totals 137,131 reviewable items, or 11.2 gigabytes. *See* Aff. of Kristine Gorman ¶¶ 4-5 (attached as Ex. B). To show the cost of searching that volume of data, CIC developed a list of nine basic search terms (such as "kettering," "mcep," and "php") and determined that applying those terms to the initial data for the three former employees would yield about 10.5 gigabytes of data. *Id.* ¶6. Any

---

[2] As noted above, CIC's proposed production in response to the subpoenas would be contingent upon revising the protective order to eliminate the provision that would allow counsel to summarize documents marked "Highly Confidential – Outside Counsel's Eyes Only" to clients. *See* Protective Order ¶16. As CIC has explained, the proprietary nature of certain of the documents to be provided by CIC would be lost if summary information were provided to either plaintiff or defendants. *See* Faruki Cert. Ex. B, C.

application of similar search terms would require reviewing the results and testing them for accuracy, processing the results and reviewing them for relevancy, privilege, and other confidentiality issues, and hosting the results on a web-based platform. *Id.* ¶7.[3] CIC estimates that such a process will require many hours of work and will cost in excess of $100,000. *Id.*

Producing the additional documents sought by the subpoenas would greatly increase the cost and burden. For example, defendants' request no. 4 asks CIC to produce, for "each year from 2006 to the present, documents sufficient to identify all claims that You paid to MCEP, including documents which identify for each claim" eight different kinds of information. Decl. of Cindy Butler ¶3 (attached as Ex. C). CIC has received more than 20,000 claims related to plaintiff and obtaining images of those claims would involve a manual process on CIC's FileNet system; a similar manual process would be needed to obtain provider vouchers for those claims. *Id.* Conducting those two searches alone would require hundreds of hours of work – and even more work would be needed if defendants' claims documents were required to be produced. *Id.*

Other requests assume that CIC maintains ready information that it does not, in fact, maintain. For example, plaintiff's specification no. 3 asks CIC to provide documents sufficient to "identify hospitals in Ohio that Anthem refused to contract with for one of more of its products 2004 to the present." Frech Decl. ¶18. Ohio is not an "any willing provider" state, and therefore CIC may contract with some entities as to certain types of products and may not contract with other entities for those same products. *Id.* CIC does not keep a list of which entities it does not contract with for some or all of its products. *Id.* As a result, CIC would need

---

[3] Because the process of negotiating and executing contracts with hospitals and other providers often raises legal issues, it is commonplace for members of CIC's contracting team to consult with and obtain advice from CIC's counsel. Frech Decl. ¶22. As a result, the records and files maintained by CIC's contracting team include documents reflecting communications with counsel, advice received from counsel, and other attorney-client privileged materials, and any review of such materials would need to include a review for privileged materials. *Id.*

to interview employees in each of its regions in Ohio[4] to attempt to reconstruct, for each year

during the ten-year period covered by the request, which entities CIC did not have contracts with

for some or all of its products and whether the entities are "hospitals." *Id.* ¶19. Because the lack

of a contract might be due to various circumstances, as opposed to a "refusal," CIC would need

to examine the circumstances of non-contracting status for each such entity. *Id.* Completing this

process would require hundreds of hours of work. *Id.*[5]

Another type of burden would be imposed if CIC were required to respond to plaintiff's

specification no. 12, which asks CIC to produce documents "related to the cost or quality of the

services provided by MCEP or any of the Defendants," because information about the "cost" and

"quality" of care could appear in many places. Butler Decl. ¶4. Complaints about care might be

voiced in calls to CIC's customer service area and described in the screens that reflect the

information obtained during the call. *Id.* Such screens are organized by member number, not by

provider. *Id.* To find the information requested by MCEP, CIC would need to identify every

individual who received care from MCEP or PHP during the time period and review each of their

customer service screens to determine whether some statement about the "cost or quality" of

service was provided. *Id.* Because CIC received tens of thousands of claims for care by plaintiff

and defendants during the relevant time period, that process alone would require hundreds of

hours of review. *Id.* Furthermore, information about "quality" of care could be found in many

other areas of CIC, each of which would need to be searched for the requested information. *Id.*

---

[4] CIC manages its provider contracts, its marketing to plan sponsors, and certain other operations through a regional rather than a state-wide approach. Frech Aff. ¶21. CIC's internal organization of its business functions therefore also makes responding to document requests that are state-wide in scope a burdensome task. *Id.*

[5] The same kind of process would be needed with respect to plaintiff's specification no. 4, which seeks "[d]ocuments sufficient to identify hospitals in Ohio that participated in any of Anthem's products within the hospital's first year of operation." Because CIC does not keep a list that provides such information, it would need to conduct the same kind of region-by-region inquiry described above. Frech Aff. ¶20. Many of the requests made by plaintiff and defendants ask CIC to find information of such "needle in the haystack" variety, and many requests presume that CIC maintains files or other materials at the ready that can be simply and expeditiously produced in response to document requests and subpoenas. Butler Decl. ¶5. That simply is not the case. *Id.*

Information about "cost" of services provided by plaintiff and defendants could be found in still other areas of CIC. Butler Decl. ¶4. Because a significant part of CIC's business involves seeking to provide health care at competitive prices, many areas of the company might look at comparative costs and, in so doing, prepare documents that compare the costs of procedures at MCEP and PHP to the costs charged by other institutions. *Id.* Identifying whether such documents exist and then determining where such documents are maintained and whether they are responsive also would require hundreds of hours of individualized inquiries. *Id.*

## III. ARGUMENT

### A. The Standards Governing Efforts To Use Subpoenas to Obtain Confidential Business And Trade Secret Information From Third Parties

In the Sixth Circuit, third parties to litigation enjoy a heightened degree of protection against requests for highly sensitive business and trade secret information, especially when the requests come from parties that can derive special competitive advantage from the information. *See In re Vitamin Antitrust Litig.*, 267 F. Supp. 2d 738, 741-42 (S.D. Ohio 2003). These protections apply even when a requesting party offers to limit disclosure to its attorneys only. *See Recycled Paper Greetings, Inc. v. Davis*, No. 1:08-MC-13, 2008 US Dist. LEXIS 10649 *12 (N.D. Ohio Feb. 13, 2008). The heightened protection reflects the explicit recognition in Rule 45(c)(3) that courts may act to quash or modify subpoenas to prevent the disclosure of trade secrets or other confidential commercial information. *See* Fed. R. Civ. P. 45(c)(3)(B).[6]

In striking the balance between a party's need for discovery and a third party's interest in protecting confidential information, courts apply a three-pronged test. First, the court considers whether the entity seeking protection has shown that the information sought is proprietary and

---

[6] Although Rule 45(c)(3) of the Federal Rules of Civil Procedure suggests that issues about protected information and undue burden should be raised through the filing of a motion to quash, the parties have agreed that CIC may present its arguments in opposition to the motions to compel filed by plaintiff and defendants, so as to avoid duplicative briefing.

that its disclosure might be harmful. If so, the court looks to whether the party seeking the discovery has established that the information is relevant and necessary to the underlying action. The party seeking discovery "must establish that the requested information is relevant **and** that its production is necessary." *Spartanburg Reg. Healthcare Sys. v. Hillenbrand Indus.*, No. 1:05-mc-107, 2005 U.S. Dist. LEXIS 30594, *11 (W.D. Mich. 2005) (emphasis in original).

If those two inquiries are answered in the affirmative, the court then balances the need for discovery of the information against the harm that will result from disclosure. Importantly, "where, as here, discovery is sought from a non party, the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the non party." *Universal Delaware v. Comdata Network*, 2011 U.S. Dist. LEXIS 28963, * 7 (M.D. Tenn. 2011) (citation omitted). *See Sagebrush Solutions, LLC v. Health Mgmt. Sys. (In re CareSource Mgmt. Group Co.)*, 289 F.R.D. 251, 253 (S.D. Ohio 2013) ("Courts are required to balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of a person as a non-party is a factor that weighs against disclosure."); *Spartanburg Reg. Healthcare Sys.*, 2005 U.S. Dist. LEXIS 30594, 2005 WL 2045818, **5-7 (W.D. Mich. 2005) (same); *Mannington Mills v. Armstrong World Indus.*, 206 F.R.D. 525, 528-29 (D. Del. 2002) (same). *See Premier Election Solutions v. Systest Labs*, No. 09-cv-01822, 2009 U.S. Dist. LEXIS 94193, *7 (D. Colo., Sept. 22, 2009) ("While the court has considerable discretion with regard to regulating discovery which is exchanged in a lawsuit, discovery from third-parties in particular must, under most circumstances, be closely regulated"); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996) (collecting cases); *A Major Difference v. Wellspring Products, LLC*, 243 F.R.D. 415, 416-17 (D. Colo. 2006).

1.   *The Information Sought Constitutes Trade Secrets And Confidential*
     *Business Information And Disclosure Would Have A Devastating Effect*

As CIC has shown, provider contracts, information about CIC's negotiations with providers, internal deliberations or analyses about contracting issues, and related documents and data constitute highly confidential, proprietary information. *See* Frech Decl. CIC considers the information to be extremely confidential and valuable and has taken precautions, in its contracts and in maintaining the security of the information, to limit access to such information within CIC and to restrict the disclosure of such information to people outside CIC. *Id.*[7]

As the Court reasoned in the *Spartanburg* case:

> that Hillenbrand seeks the production of sensitive and confidential business information is apparent from the very nature of the requests at issue. For example, as noted above, Hillenbrand requests that Steelcase produce documents regarding: (1) "planning and competitive and strategic analysis;" (2) "data compilations and analyses;" (3) "actual or forecasted business and/or financial performance;" (4) sales revenue and market share; and (5) how Steelcase defines "the product markets in which [it] compete[s]." It is unreasonable to assert that such requests do not seek the production of confidential and proprietary business information.

*Spartanburg*, at *10. Indeed, this Court may properly find that the "confidential nature of the information sought is self-evident." *Universal Delaware* at *11. "Strategic information [about] how one competes in the marketplace is confidential by its very nature, particularly when steps are taken to keep this information from the public." *Id.*

Moreover, CIC has established that disclosure of this highly sensitive information would have a devastating and immediate impact – particularly in view of plaintiff's and defendants' status as parties that directly and regularly negotiate contracts with CIC, and that may soon compete with CIC. Indeed, the motions to compel would ask CIC to produce its extremely

---

[7] Courts are mindful of requiring parties seeking to protect confidential business to provide detailed information about the precise nature of the information, because "[t]o require the affiants to provide more detail would necessitate that they divulge the very sore of information which they are attempting to protect." *Spartanburg*, at *9-10. Here, Mr. Frech has explained the competitive nature of CIC's business, the nature of the information and why it is confidential, and the steps CIC takes to prevent disclosure of that information. *See* Frech Decl.

confidential contracting and negotiation documents at the very same time it is negotiating a new contract with defendants, which recently sent a formal notice of termination of their existing contract with CIC. *See* Frech Decl. ¶13. CIC should not be required to disclose its contracting strategies and deliberations to the very party that is currently sitting across the negotiating table.

In short, CIC has demonstrated that plaintiff and defendants are seeking information "detailing sensitive and confidential aspects of [Anthem's] business strategy," *Spartanburg*, at *10, as well as documents that would give plaintiff and defendants a huge, unfair advantage in their negotiations with CIC – and in their potential direct competition with CIC. *See id.* ("as courts have long recognized, disclosure of sensitive business information to a competitor is more harmful than disclosure to a noncompetitor") (quotations and citation omitted).

Furthermore, disclosure of the information to the parties – and, at trial, to the world at large – would also harm consumers in the market for health insurance in the Dayton area. By learning CIC's provider contracting strategies and analyses, and by seeing what CIC pays to all other hospital providers, plaintiff and defendants would be well equipped to seek higher prices and enhanced reimbursement provisions. Ironically, such information might enable the plaintiff and the defendants in this antitrust case to use the subpoena power to ultimately achieve the kind of anti-competitive effect that the antitrust laws are designed to preclude.

2.   *The Information Sought From CIC Through The Motion To Compel Is Not Necessary To The Prosecution Or Defense Of The Claims In This Case*

As noted, CIC's claimed involvement in the issues raised by this case is sharply limited. Plaintiff simply accuses defendants of "coercing, compelling, co-opting or financially inducing commercial health insurers or managed care plan providers, including [CIC] ... to refuse to permit the Medical Center full access to their respective networks." Am. Cmplt. ¶74(a).

CIC's proposed production would provide documents directly responsive to this single reference to CIC. CIC would produce its contracts with defendants, with only pricing terms redacted, so plaintiff can review the contracts to see whether they support that lone allegation. CIC would produce communications with Premier about contracting with plaintiff. CIC also would produce its contracts with plaintiff, with pricing terms redacted, and communications with plaintiff and with Kettering about contracting with plaintiff, so defendants assess the status of contracting with plaintiff. Those documents provide plaintiff and defendants with information sufficient to allow them to test whether, as plaintiff alleges, defendants "coerc[ed], compel[ed], co-opt[ed], or financially induc[ed]" CIC "to refuse to permit [plaintiff] full access" to its networks. *See* Am. Cmplt. ¶74(a). Given the very limited nature of CIC's alleged involvement, there is no need for the parties to see pricing information, review CIC's internal contracting analyses and strategies, probe into CIC's internal deliberations about contract negotiations, or obtain any of the other highly confidential information sought by the motions to compel.

Furthermore, because the focus of plaintiff's allegation is on defendants' alleged interaction with CIC, there is no basis for claiming that the parties have a need to review CIC's internal thought processes. As one court observed:

> While information regarding the existence (or lack thereof) of competition in this particular sub-market *may* be relevant to resolution of the claims advanced in the South Carolina action, what Hillenbrand seeks to obtain through the subpoena at issue is information of an entirely different character. While *factual* information regarding the market for in-room furniture products (e.g., information regarding the nature of Steelcase's in-room furniture products or the price at which Steelcase has offered such products to actual or potential purchasers), *may* be relevant, Hillenbrand instead seeks to obtain confidential information regarding the *thought processes* by which Steelcase develops, prices, and markets its products. *The Court discerns no legitimate use for such information* [about thought processes] *and Hillenbrand has presented no authority suggesting otherwise*.

*Spartanburg*, at \*11-12 (emphasis added in part); *see also Universal Delaware*, at \*13-14 & \*9 ("It seems clear that the [identities and] number of customers Fleet One [the third party resisting discovery] has won over from Comdata is directly relevant to Comdata's position . . . that competition in the relevant market is fierce and that Comdata has not monopolized the market." But that Comdata is not entitled to know "the reasons that Fleet One won those customers' business."); *Act, Inc. v. Sylvan Learning Sys.*, No. 99-63, 1999 U.S. Dist. LEXIS 7055, \*8-9, 10 (E.D. Pa. May 14, 1999) (disclosing information regarding third-party's "perspectives of the players in th[e] market, assessment of potential and existing competitors, evaluations of competitive conditions, discussions of the risks of entering in the market, . . ." was not necessary when, *inter alia*, the requesting party did not make any showing why third-party's "perspective" on the market is "relevant or necessary" to its claims; court prevented third party's disclosure of "internal memoranda . . . reflecting in any way upon possible business combinations" because they are "clearly confidential and marginally relevant . . . at best.").

The parties' claimed need for the documents CIC has declined to produce simply does not withstand scrutiny. For example, plaintiff claims it needs broad information about CIC's interaction with other providers "given what appears to be Anthem's position regarding its refusal to contract with MCEP." Pl's Mot. to Compel, at 3 (emphasis added); *see also id.* at 7. That purported basis not only is speculative on its face, it also ignores that CIC has agreed to allow plaintiff to search the e-mailboxes of its contracting personnel to see if there are the kinds of communications with defendants that the Complaint apparently contemplates. With access to contract documents with defendants and e-mail communications, there is no need for plaintiff to go rooting through CIC's documents related to its interactions with other providers or CIC's internal deliberations about its negotiations and contracting status with plaintiff.

Plaintiff next contends it needs the documents to see whether CIC's stated reasons for its contracting decisions as to plaintiff "are pretexts intended to cover up the conspiracy." Pl's Mot. to Compel, at 4; *id.* (request for communications "that Anthem had with other plans regarding MCEP" "goes directly to the scope of the conspiracy."). Of course, as the lone mention of CIC in the Amended Complaint reflects, plaintiff does not allege that CIC is a part of any conspiracy – and in any case plaintiff's rank speculation is simply insufficient to establish a true need for highly proprietary documents that would have devastating consequences if disclosed.[8]

Defendants' claimed justifications for the documents it seeks similarly do not establish a true need. Defendants first argue that they need CIC's internal communications, deliberations, and analyses to assess the circumstances of plaintiff's contract status with CIC. Defs' Mot. to Compel, at 2, 4. CIC's proposal would provide defendants with contracts with plaintiff, communications between CIC and plaintiff about contracting issues, and communications between CIC and Kettering that address plaintiff's contracting issues. With such direct evidence of plaintiff's contracting status and circumstances being provided, there is simply no need for production of internal deliberations and strategic documents that would expose CIC's core strategies and techniques and risk devastating harm to CIC's competitive position.

Defendants next contend they need claims data regarding plaintiff, and submit such data can be obtained through a "routine data run" and that "Anthem's claims data is certain to be

---

[8] Plaintiff's other arguments also do not establish need. Defendants' claimed argument that defendants' contracts with CIC and others are not unique, Pl's Mot. to Compel at 4, 6, does not support requiring CIC to produce its contracts with other providers. If defendants have such documents, defendants can produce those contracts or have their argument fail for lack of proof; there is no reason why defendants' posturing should require CIC to disclose its proprietary documents. Plaintiff also admits its request for documents about cost and quality at defendants' hospitals is a purely reciprocal request made because defendants asked for such documents for some reason, Pl's Mot. to Compel at 5, which necessarily means that plaintiff has no independent need for such documents. Plaintiff's argument that it needs CIC's comparisons of cost of services among competing hospitals in the Dayton area – which constitutes core proprietary information by anyone's measure – because cost is relevant to "market power," Pls' Mot. to Compel at 5, is unsupported by any citation to evidence or authority and ignores the availability of other means of establishing market power that do not require providing hospitals with their competitors' confidential contracts. Finally, plaintiffs' lack of need for documents about conditions in the Dayton area during the time period before plaintiff even began its operations, *see* Pls' Mot. to Compel at 5-6, is self-evident.

more comprehensive and better maintained than any claims data available from Plaintiff." Defs'

Mot. to Compel, at 5. There is no evidentiary basis whatsoever for these speculative arguments.

More importantly, defendants recognize that they can obtain the claims data from plaintiff –

which, as the party which began the lawsuit, has no basis for objecting or claiming undue

burden. With claims data admittedly available from plaintiff, there is no need to burden CIC.

Defendants next argue that they need contracts with other Dayton area hospitals and

documents reflecting CIC's deliberations about such contracts – including CIC's contracts with

Premier's direct competitor, Kettering – because "[i]nformation about Anthem's relationship

with Dayton area hospitals is critical to assessing the size, strength, and operation of the

marketplace." Defs' Mot. to Compel, at 6. Defendants do not provide an expert affidavit, or cite

a single case, treatise, or other source that holds that a non-party's contracts with a non-party or

deliberations about a contract with a non-party is necessary to assess a "marketplace." Equally

important, defendants argue that they "could not efficiently obtain such market-wide information

elsewhere" and that "only limited information about Dayton area hospitals is publicly available."

*Id.* That argument acknowledges that there are other sources of "market-wide information" and

means it is not necessary that defendants invade the secrecy of documents held by CIC in order

to address what appears to be a tangential aspect of this lawsuit.

Finally, defendants argue that they need information about CIC policies about physician-

owned hospitals because such information is "relevant to whether Plaintiff can show, not only

that a purported antitrust injury has occurred, but whether any such antitrust injury was caused

by per se illegal conduct and not other independent market factors." Defs' Mot. to Compel, at 7.

This rationale also does not establish that production of CIC's confidential contracting

documents is necessary. CIC will produce its contract with plaintiff, with pricing information

redacted, and also will produce communications between and among CIC, plaintiff, and Kettering about such contracting. That information will allow defendants to assess plaintiff's contract status, without requiring CIC to divulge its confidential and proprietary policies.

3. *The Documents CIC Has Agreed To Produce Strike An Appropriate Balance Between The Need for Discovery And The Harm Inflicted By Disclosure Of The Broad Range Of Documents Sought By The Motion*

CIC is not trying to bar all discovery. It has agreed to produce documents that are directly implicated by plaintiff's allegation and to allow the parties to search the e-mailboxes of the five individuals responsible for CIC's Dayton contracting activities. However, CIC has legitimate interests in protecting highly proprietary information from being produced to parties that negotiate contracts with CIC and that are in competition with each other and with other hospitals whose confidential contracts they seek to obtain. CIC has shown how and why the disclosure of such information could have a devastating impact on its ability to compete and on the price of health care, and competition in the health care marketplace, in the Dayton area.

Under such circumstances, this Court should find that CIC's proposed approach to the subpoenas strikes the proper balance, by providing pertinent information while protecting against the disclosure of information CIC has a legitimate interest in maintaining in confidence. *See Spartanburg*, at \*14 ("When balancing Hillenbrand's alleged need for the requested information against the potential injury that would result to Steelcase if such material were produced, the Court concludes that the balancing weighs heavily in Steelcase's favor. Given the volume of material requested and its extremely sensitive nature, the potential harm to Steelcase is significant and easily outweighs whatever need Hillenbrand may have for such material."); *Universal Delaware*, at \*16 ("[T]he harm from disclosure of [third party's] business strategy exceeds any alleged injury to [the party's seeking disclosure."). As one court reasoned:

Without showing any real need for the information in relation to the Pennsylvania action, Comdata seeks discovery from its primary competitor - a non-party - about how that competitor woos customers and what relationship that competitor has with other companies with which Comdata deals or might deal. This is clearly confidential information and information which allows Fleet One to compete effectively in the marketplace against Comdata. Notwithstanding the broad scope of discovery in civil litigation, information which could place one at a competitive disadvantage is generally afforded protection under the discovery rules. *See, Recycled Paper Greetings, Inc. v. Davis*, 2008 U.S. Dist. LEXIS 10649, 2008 WL 440458 at **3-4 (N.D. Ohio Feb. 13, 2008); *Cohen v. City of New York*, 255 F.R.D. 110, 118 (S.D.N.Y. 2008)

*Universal Delaware*, at *17-18 (emphasis added).

### 4. The Documents Sought By The Motions To Compel Would Impose An Undue Burden On CIC

Parties serving subpoenas "must take reasonable steps to avoid imposing undue burden or expense on the person subject to the subpoena." Fed. R. Civ. P. 45(c)(1). Courts thus have noted that "the status of a person as a non-party is a factor that weighs against disclosure," especially as to the "expense and inconvenience" of complying with the subpoena. *Am. Elec. Power Co. v. U.S.*, 191 F.R.D. 132, 136 (S.D. Ohio 1999). Here, the subpoenas impose undue burden and expense upon CIC. CIC already has incurred burden and expense, and complying with the additional document request obligations set forth in the parties' subpoenas would require hundreds of hours of additional work and tens of thousands of dollars in costs. By any measure, the subpoenas would impose an undue burden. *See Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2006); *Vietnam Veterans of Am. v. CIA*, No. 2:11-mc-16, 2011 U.S. Dist. LEXIS 115802, at *15 (S.D. Ohio Oct. 6, 2011); *In re Caresource*, 289 F.R.D. at 254; *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253-56 (S.D. Ohio 2011).

### 5. The Protective Order Does Not Solve The Disclosure Problems

The existence of a protective order should not alter the balance or weigh in favor of requiring CIC to disclose its highly confidential documents. The parties have the burden of

showing "substantial need" irrespective of a protective order, and they have not done so. *See Act, Inc.*, at *7 n. 5 ("[T]he plain language of Rule 45(c)(3)(B) requires that the 'substantial need' showing be made as a threshold matter regardless of the terms under which the material would be produced if production were ordered."); *Universal Delaware*, at *18-19 ("There is a constant danger inherent in disclosure of confidential information pursuant to a Protective Order and, therefore, the party requesting disclosure must make a strong showing of need, especially when confidential information sought from a non-party is sought.") (quotations omitted).

In addition, the protective order simply does not cure the problems with the subpoenas. Any production of CIC's confidential information outside the company, even if done pursuant to a protective order, increases the risk that the highly sensitive information will be disclosed in a way that harms CIC's legitimate interests. The protective order will not prevent the materials from becoming public at any trial. Furthermore, the protective order does not and cannot remedy the burdens that would be imposed on CIC if the motions to compel were granted and CIC were required to produce documents in response to the parties' overbroad requests.

## IV.  CONCLUSION

For all of the foregoing reasons, the motions to compel filed by plaintiff and by defendants should be denied in their entirety.

Respectfully submitted,

/s/ Glenn V. Whitaker
Glenn V. Whitaker (0018169)
Vorys, Sater, Seymour and Pease, LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202
Telephone: 513.723.4608
Facsimile: 513.852.8450
Email: gvwhitaker@vorys.com

20

Robert N. Webner
Vorys, Sater, Seymour and Pease, LLP
52 East Gay Street
Columbus, Ohio 43215
Telephone: 614.464.8243
Facsimile: 614.719.5083
Email: rnwebner@vorys.com

*Attorneys for Community Insurance Company*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 29, 2013, I caused a true and correct copy of the foregoing Combined Memorandum of Community Insurance Company in Opposition to Motions to Compel of Plaintiff and Defendants to be electronically filed with the Court and served on all parties through this Court's ECF system.

/s/ Robert N. Webner
Robert N. Webner