UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| THE MEDICAL CENTER AT ELIZABETH PLACE, LLC, | : : : | Case No. 3:12-cv-26 |
| Plaintiff, | : : | Judge Timothy S. Black |
| vs. | : : | |
| PREMIER HEALTH PARTNERS, *et al.*, | : : | |
| Defendants. | : | |

**ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' AND PLAINTIFF'S MOTIONS TO COMPEL
(Docs. 59 and 63)**

This civil action is before the Court on Defendants' and Plaintiff's motions to compel (Docs. 59 and 63) non-party subpoena recipient Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield ("Anthem") to produce documents.  Anthem has filed its comprehensive memorandum *contra* (Doc. 66), and the moving parties have filed reply memoranda (Docs. 70, 74).  The Court heard oral argument on September 30, 2013.

## I.    BACKGROUND FACTS

Anthem is the largest insurer in the Dayton area.  Plaintiff's theory is essentially that Plaintiff was denied contracts with managed care providers as a result of a purported conspiracy orchestrated by Premier (and including Anthem) to exclude Plaintiff from the marketplace.

1

The Amended Complaint alleges that Defendants "coerc[ed], compelled], co-opted] or financially induced] commercial health insurers or managed care providers, *including Anthem* ... to refuse to permit [MCEP] full access to their respective networks." (Doc. 7 at ¶ 74(a) (emphasis added)).  The Amended Complaint further alleges that Defendants coerced commercial health insurers "to provide reimbursement rates that were below market and below the rates and on different terms from the Hospital Defendants demanded for the exact same services."  (*Id.* at ¶ 74(f)).

The parties maintain that the documents they seek from Anthem go directly to these allegations.  The Court agrees that the nature of and rationale for Anthem's actions in its relationship with Plaintiff are central to evaluating the claim that Anthem acted in concert with Premier to harm Plaintiff.

Both Plaintiff and Defendant served subpoenas on Anthem to obtain documents related to the alleged conspiracy.  Anthem has agreed to produce its communications with each of the parties, but not its internal deliberations regarding the parties.  Anthem claims that the parties seek to compel a burdensome array of highly confidential documents that would, among other things, disclose Anthem's strategies in negotiating contracts with the parties.

2

Anthem has agreed to produce the following:[1]

(1) Anthem preserved the electronic mailboxes of the three employees responsible for hospital contracting in the Dayton area from 2006 to 2009 and would search those e-mailboxes as well as the e-mailboxes of the two people responsible for hospital contracting in the Dayton area since 2009.  Anthem requested that the parties agree on one set of search terms to be applied to the five e-mailboxes;

(2) Contracts with Plaintiff and Defendants from 2006 to the present, with all pricing terms redacted, subject to a modified protective order;

(3) Communications between Anthem and Plaintiff about contracting from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above;

(4) Communications between Anthem and Plaintiff about Premier and between Anthem and Premier about Plaintiff from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above;

(5) Communications between Anthem and Kettering about a contract with Plaintiff from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above;

(6) For the period 2006 to the present, a list and summary of each product it offered in the Dayton area and a list and summary of the number of its subscribers enrolled in each product; and

(7) Non-confidential documents that set forth its policies, rules, and access standards for participation in Anthem networks.

Anthem claims that the production of these documents alone will cost in excess of

$100,000.00.  (Doc. 66-1 at  ¶ 7).

---

[1]  Anthem's proposed agreed production was contingent upon revising the protective order to eliminate the provision that would allow counsel to summarily evaluate for clients documents marked "Highly Confidential – Outside Counsel's Eyes Only".  (Doc. 43 at ¶ 16).

3

Anthem refuses to produce the following three categories of documents unless the Court orders it to do so:

(1) Anthem's internal communications, analyses and claims paid data relating to Plaintiff;

(2) Anthem's contracts with other providers in the Dayton area, and documents reflecting the negotiations, communications and internal analyses regarding such contracts and providers; and

(3) Documents reflecting Anthem's policies toward physician-owned hospitals in the Dayton area.

(Doc. 59, Ex. D).

## II.    STANDARD OF REVIEW

The Federal Rules of Civil Procedure grant parties the right to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Relevance for discovery purposes is extremely broad. *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). However, "district courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007).

Under Rule 45 of the Federal Rules of Civil Procedure, parties may command a nonparty to, *inter alia*, produce documents. Fed. R. Civ. P. 45(a)(1). Rule 45 further provides that "the issuing court must quash or modify a subpoena that…requires disclosure of privileged or other protected matter, if no exception or waiver applies; or subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3)(A)(iii), (iv). Although

4

irrelevance or overbreadth are not specifically listed under Rule 45 as a basis for quashing a subpoena, courts "have held that the scope of discovery under a subpoena is the same as the scope of discovery under Rule 26." *Hendricks v. Total Quality Logistics*, 275 F.R.D. 251, 253 (S.D. Ohio 2011).

In striking the balance between a party's need for discovery and a non-party's interest in protecting confidential information, courts apply a three-pronged test. First, the court considers whether the entity seeking protection has shown that the information sought is proprietary and that its disclosure might be harmful. If so, the court looks to whether the party seeking the discovery has established that the information is relevant and necessary to the underlying action. *Spartanburg Reg. Healthcare Sys. v. Hillenbrand Indus.*, No. 1:05mc107, 2005 U.S. Dist. LEXIS 30594, at *11 (W.D. Mich. Aug. 24, 2005). If those two inquiries are answered in the affirmative, the court then balances the need for discovery of the information against the harm that will result from disclosure. "Where, as here, discovery is sought from a non party, the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on the non party." *Universal Delaware v. Comdata Network*, No. 3:10mc104, 2011 U.S. Dist. LEXIS 28963, at *7 (M.D. Tenn. Mar. 21, 2011).[2]

---

[2] *See, e.g., Sagebrush Solutions, LLC v. Health Mgmt. Sys. (In re CareSource Mgmt. Group Co.)*, 289 F.R.D. 251, 253 (S.D. Ohio 2013) ("Courts are required to balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of a person as a non-party is a factor that weighs against disclosure.").

This Court has already ruled twice in this case that the type of information that the parties seek from Anthem is relevant and shall be produced by non-parties Kettering Health Network and Riverview Health Institute, despite their strenuous objections.

## III.    ANALYSIS

### A.    Defendants' Requests

Anthem's dispute with Defendants involves only three discrete categories of documents.

Defendants maintain that only five Anthem employees worked in the Dayton area during the period covered by the subpoena.  (Doc. 59, Ex. D at 3).  Defendants maintain that Anthem could identify the documents at issue by running search terms across these five employees' electronic documents and conducting targeted searches of Anthem's hard copy files for the Dayton area.  As set forth in this Order, Anthem shall do so.

#### 1. *Anthem's Internal Communications, Analyses, and Claims Paid Data Relating to MCEP (Request Nos. 2, 4, 7)*

##### a.  Internal communications and analyses

Defendants maintain that Anthem's internal communications, deliberations and analyses regarding Plaintiff, including Anthem's decisions whether or not to contract with Plaintiff, are relevant to Plaintiff's allegations that it was denied contracts with managed care payors, or had to accept such contracts on less desirable terms due to an alleged "boycott."  (Doc. 59, Ex. A).  Defendants claim they need this discovery to uncover the actual reasons why Plaintiff allegedly could not obtain contracts with

Anthem or on the terms that Plaintiff wanted. *See Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc*., No. 95-5574, 2005 U.S. Dist. LEXIS 41855, at *9-10 (D.N.J. Jan. 19, 2005) (Plaintiff's "causation evidence…must establish that the injuries which plaintiff claims are attributable to the antitrust conspiracy, and not to other factors," and that "the illegality was a material cause of the alleged injury.").

Anthem's documents are especially relevant in light of news articles where it is reported that Anthem offered Plaintiff a contract in 2008, but Plaintiff rejected it. (Doc. 59, Ex. 1). Plaintiff's CEO, Alex Rintoul, said that "[a]n Anthem contract would be a linchpin for MCEP ... and could well open the door to a contract with United-Healthcare." (*Id*.) A few months later, another news article reported that Plaintiff had finalized a contract with Anthem to participate in its "traditional, all managed care and 'Senior Advantage'" networks. (*Id.*, Ex. 2). At the time, Rintoul said that the Anthem contract "should mean a 35 percent increase in Plaintiff's patient volumes." (*Id*.) These articles underscore the importance of Anthem to Plaintiff and its relevance to the allegations in the Amended Complaint.

Plaintiff opened in September 2006, but did not enter into a contract with Anthem until 2009, after Kettering had purchased a 50% ownership interest in Plaintiff and taken over negotiations with payers on Plaintiff's behalf. (Doc. 74, Ex. B at 168). Before Kettering purchased its ownership interest in Plaintiff, Anthem's representative told Plaintiff that it would have to be in business for a full year before it could be considered for a contract. (Doc. 74-1 at 120). After the one year had passed, Anthem offered

Plaintiff a contract, but Plaintiff deemed its terms unreasonable and rejected it. (*Id.* at 140-142). Specifically, Plaintiff found Anthem's proposal to be too limited in the products that it covered and the reimbursement rates were below its expectations. (*Id.*)

Plaintiff's CEO testified that he believes that Anthem's representative created the requirement that providers must be in operation for one year before contracting with Anthem as a pretext to keep Plaintiff out of network. (*Id.* at 132-133). He believes that it was not official Anthem policy because he knows of other hospital providers in other markets that were not required to wait a year before entering a contract with Anthem. (*Id.*) Plaintiff's CEO also testified that, at an early meeting between Anthem and Plaintiff, Anthem's representative made a cryptic reference to a "secret handshake" that Plaintiff would have to learn before it could obtain a contract. (*Id*. at 122-124). No one ever asked Anthem's representative to explain his reference to the "secret handshake" or to elaborate on the information that Plaintiff needed to learn to get a contract. (*Id.*) Instead, Plaintiff's CEO inferred that the reference to the "secret handshake" was meant to insinuate that a hidden force or "power that be" was at work to deny Plaintiff a contract with Anthem. (*Id*.) Plaintiff further inferred that those hidden forces involved Premier Health Partners. (*Id*.)

In 2009, Kettering's contracting representative, Bryan Weber, secured a contract with Anthem on Plaintiff's behalf. (Doc. 74-2 at 168). Weber described negotiations with Anthem as "lengthy and complex," but was not aware of any facts suggesting that Premier influenced those negotiations in any way. (*Id.* at 80). He testified that Anthem

8

would not provide Plaintiff the rates that Plaintiff wanted because Anthem analogized Plaintiff to an outpatient surgery center, which does not receive rates equivalent to those received by hospitals. (*Id*. at 134-136). It was also more difficult to negotiate Plaintiff's rates because Anthem's large market share gave it substantial leverage and Anthem simply did not need Plaintiff's 26 beds in its provider network. (*Id.* at 204-206, 215-216; 268-269). Weber worked at Anthem for thirteen-and-one half years in the Dayton area before he joined Kettering in 2008. (*Id.* at 14-15). Weber testified that, in the eighteen-plus years that he has been in the insurance industry in Dayton he was not aware of any facts indicating that Plaintiff was ever denied access to a payer's network or provided reimbursement rates that were below market or below the rates that Premier received for the same services as a result of any coercion by Premier or any of the Defendants. (*Id*. at 399-406).

Defendants maintain that only Anthem's internal communications, analyses, and deliberations can resolve the discrepancy between: (1) Plaintiff's inferences about why it had difficulties getting a contract with Anthem; and (2) Weber's testimony that Plaintiff's difficulties were caused by Anthem's substantial leverage as the largest payer in the Dayton area, Anthem's characterization of Plaintiff as an outpatient surgery center, and the fact that Anthem simply did not need Plaintiff in its network to meet its obligations to its insureds. Anthem's internal documents are needed to explain why Anthem offered Plaintiff the rates that it did and Anthem's internal analyses are required to determine how Anthem viewed Plaintiff as a participant in the market and whether Plaintiff's

9

perceived difficulties obtaining a satisfactory contract with Anthem were the result of any alleged boycott or instead independent market forces and independent decisions. (Doc. 74, Ex. C at ¶ 17).

Anthem agrees to produce its communications with Plaintiff, but objects to producing any documents that contain or reflect Anthem's internal communications, analyses, and deliberations relating to Plaintiff.

The Court finds that the documents sought are highly relevant and that the burden of production upon Anthem is not undue.  Accordingly, Anthem shall produce the requested documents, to wit: Anthem's internal communications, deliberations and analyses regarding Plaintiff, including Anthem's decisions whether or not to contract with Plaintiff.

### b.  Claims paid data

Defendants also request certain claims data regarding Plaintiff because Defendants' expert needs managed care payors' claims data to assess Plaintiff's competitive position in the Dayton area marketplace (as well as the Dayton area marketplace itself ).[3]  (Doc. 59, Ex. A).

Anthem objects to this request on undue burden grounds, claiming that responding to this request would require it to obtain "more than 20,000 claims" through a "manual

---

[3]  This request asks Anthem to execute a routine data run from its claims database.  Defendants do not seek any patient identification information, and other payors have avoided any concerns regarding the Health Insurance Portability and Accountability Act ("HIPAA") by substituting placeholders for such information in the data that they produce.  None of the other managed care payors that received this identical request from Defendants have objected to it.

process" amounting to "hundreds of hours of work." (Doc. 66 at 8).[4] Additionally, Anthem argues that Defendants should obtain Plaintiffs' claims data from Plaintiff and not Anthem.[5]

The need to obtain this information from the non-party Anthem is because Plaintiff's records apparently do not capture the information sought. Had Plaintiff recorded this information in the first instance, the parties would not be putting the non-party to the expense and burden of production. Accordingly, if the parties desire this information, Plaintiff and Defendants shall each bear one-half of Anthem's reasonable and necessary financial cost of production.

### 2. *Anthem's Contracts with Other Providers in the Dayton Area Including Kettering Health Network, and Documents Reflecting the Negotiations and Communications Regarding Such Contracts (Requests No. 8, 9, 10, 13)*

Next, Defendants requested that Anthem produce its contracts with other hospital providers in the Dayton area and documents reflecting Anthem's negotiations and communications about such contracts so that Defendants can evaluate the merits of

---

[4] Based on discussions with other payers regarding their document productions in this case, Defendants maintain that payers process nearly all claims for reimbursement electronically and maintain an electronic database of the same and to produce claims data Anthem should only need to query the database. Other payers (such as United HealthCare – the second largest payer in Dayton) have already produced such documents. (Doc. 74 at 3).

[5] Defendants recognize that they can obtain claims data from Plaintiff (Doc. 59 at 5), which, as the party who began the lawsuit, has no basis for objecting or claiming undue burden. However, Plaintiff has produced its claims data and having reviewed it, Defendants argue that it is disorganized and incomplete. (Doc. 74, Ex. D at ¶¶ 6-8). Plaintiff's counsel acknowledged the incompleteness and agreed that Anthem's claims data for Plaintiff is likely to be more complete than any claims data maintained by Plaintiff. Anthem claims it would take 52 work days to produce this information.

Plaintiff's *per se* claim.  Defendants claim that information about Anthem's relationships with Dayton area hospitals is critical to assessing the size, strength and operation of the marketplace.  That assessment will inform the determination of whether Plaintiff's *per se* claim is viable or whether any purported antitrust injury has occurred.[6]

To establish a Section 1 claim, Plaintiff must show not only that it was injured by Defendants' alleged conduct, but also that the challenged conduct had an actual adverse effect on competition as a whole in the relevant markets.  Therefore, Defendants maintain that to defend themselves, they must understand and explain the impact of the challenged conduct on competition in the Dayton area markets at issue.  (Doc. 74-3 at ¶ 6).

Anthem refuses to produce its contracts with any hospital provider in the Dayton area other than Plaintiff, or any documents relating to its negotiations or communications regarding such contracts, on confidentiality grounds.  (Doc. 59, Ex. A). Additionally, Anthem claims that the documents are irrelevant because there is no evidence that deliberations about a contract with a non-party is necessary to assess a "marketplace." Finally, Plaintiff argues that Defendants' statement that they "could not efficiently obtain such market-wide information elsewhere" (Doc. 59 at 6) acknowledges that there are other sources of "market-wide information" and thus it is not necessary that Defendants invade the secrecy of documents held by Anthem.

---

[6] *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (before applying the *per se* rule, courts must evaluate whether the practice "would always or almost always tend to restrict competition and decrease output" or could be "justified by plausible argument that [it was] intended to enhance overall efficiency and make markets more competitive").

The Court is persuaded that the burden upon Anthem to produce the pricing terms of its contracts with other Dayton area hospitals, and Anthem's internal communications about those contracts, is undue and that the preserved confidentiality of Anthem's contracts' pricing terms trumps the parties' desire to empty Anthem's internal communications about highly confidential business strategies. The Court is not convinced that the parties cannot evaluate the marketplace without raiding Anthem's secrets. There are other sources of "market-wide information." Accordingly, the parties' demand that Anthem produce the pricing terms of Anthem's contracts with other Dayton area hospitals, and Anthem's internal communications about those contracts, is denied.[7]

### 3. *Documents Reflecting Anthem's Policies Toward Physician-Owned Hospitals in the Dayton Area*

Finally, Defendants request documents reflecting Anthem's policies toward physician owned hospitals that were applicable in the Dayton area from 2006 to the present. Defendants claim that payors' policies toward physician-owned hospitals in the Dayton area are relevant to whether Plaintiff can show, not only that a purported antitrust

---

[7] The need for the Riverview production as ordered was more compelling than the generalized need for production from Anthem – as Riverview competes in the hospital services business in Dayton in the very manner Plaintiff claims is impossible – out-of-network, without government payer patients, and from the same building Plaintiff is located. As to Kettering's protestation of risks to confidentiality, the Court's order to Kettering to produce was fueled in part by the fact that Kettering is now a 49% owner of Plaintiff. As this case develops, and the Court's exposure and understanding evolves, the Court seeks to reign in overly exhaustive discovery of the marketplace and instead focus on determining whether the underlying material facts are undisputed.

injury has occurred, but whether any such antitrust injury was caused by per se illegal conduct and not other independent market factors.[8]

Specifically, the parties and the fact-finders need to understand the reasons why Anthem made its contracting decisions. Plaintiff is a physician-owned hospital, and if Anthem has policies regarding how it views or interacts with physician-owned hospitals, such information is highly relevant. Such polices would help inform how the marketplace operates in the Dayton area and whether Plaintiff's alleged injuries were caused by independent market factors unrelated to any alleged conduct by Defendants.

Anthem has agreed produce its contract with Plaintiff, with pricing information redacted, and will produce communications between and among Anthem, Plaintiff, and Kettering about such contracting. However, Anthem claims that its confidential policies toward physician-owned hospitals in the Dayton area are unnecessary to Defendants' defenses.

The Court finds that Anthem's policies toward physician-owned hospitals that were applicable in the Dayton area from 2006 to the present, if any, are highly relevant and shall be produced by Anthem at its expense.

**B. Confidentiality**

Anthem maintains that its ability to effectively negotiate contracts is contingent upon keeping the terms and conditions of its contracts with providers strictly confidential.

---

[8] *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (per se plaintiff must show antitrust injury and "can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior").

(Doc. 66-1at ¶ 5). Anthem views all materials and techniques it uses to analyze cost, quality, and treatment patterns, forecast future usage and cast trends, plan negotiation strategies, develop contract proposals, and analyze providers as strictly confidential, trade secret material. (*Id*. at ¶ 10). Anthem claims that if such information became known to the providers they would have a road map to its methods and goals and would put it at an impossible disadvantage in contract negotiations. (*Id*.)

Anthem maintains that the danger of significant competitive harm if its confidential materials are discloses is particularly acute in Dayton, where Premier and Kettering have made Dayton a virtual two-hospital marketplace. (Doc. 66-1 at ¶ 11). Premier is a defendant and Kettering holds a large ownership interest in the Plaintiff. As a result, Anthem claims that any production of its confidential contracting documents would be made to representatives of the two dominant hospital systems in the area, each of which is looking for a means to gain an advantage in their contracting negotiations with Anthem. If the parties were to obtain its confidential information, it would reduce pricing competition in the Dayton area and increase health care costs. (*Id*. at ¶ 12). In fact, Anthem is currently engaged in contract negotiations with Premier. (*Id*. at ¶ 13).

However, the allegation that production of Anthem's confidential materials would undercut Anthem's current contract negotiations with Premier is unfounded because none of the attorneys serving as Defendants' counsel in this case have any part in Premier's negotiations of its managed care contracts with payers, including Anthem. Therefore, to keep any sensitive materials from Premier, Anthem need only designate them as "Highly

Confidential – Attorneys' Eyes Only." Additionally, Premier represents that it is not building an Accountable Care Organization. (Doc. 74 at 6). Finally, the previous litigation that Anthem references is irrelevant to this case.

This Court has already determined that the Protective Order is sufficient to protect the commercially sensitive information of two businesses (Kettering and Riverview) that compete with Premier. Anthem is no different.

### C. Protective Order

Anthem claims that the Protective Order does not provide adequate protection for the highly confidential materials sought by the subpoenas.

Assuming the information possesses the sensitivity that Anthem attributes to it, Anthem's concerns assume that the parties will violate the Protective Order. There is no basis to presume that such a violation will occur. This Court has repeatedly recognized that an appropriate Protective Order provides the necessary safeguards. *See, e.g., E3 Biofuels, LLC v. Biothane Corp*., No. 1:12-mc-76, 2013 U.S. Dist. LEXIS 100793, at *3 (S.D. Ohio July 18, 2013) ("This Court has routinely approved proposed protective orders seeking to protect both 'confidential' and 'highly confidential/attorney eyes only' material when, in addition to trade secret or other confidential research, development, or commercial information, particularly sensitive information of a similar nature may be disclosed through discovery and would cause competitive harm if publicly revealed."). *See also* the Minute Entry and Notation Order of 2/20/13 in the instant case.

The analysis is the same as to Anthem here.

16

**D.  Burden**

Anthem maintains that the subpoenas will impose a significant financial burden. Anthem claims that the cost Anthem will incur in order to review all the collection of emails from the identified employees will exceed $100,000.  (Doc. 66-1 at ¶ 7).  And Anthem plausibly posits that producing the additional documents sought by the subpoenas would further increase the cost and burden.

Defendants maintain that Anthem has already agreed to search the e-mailboxes of the five custodians who handled contract negotiations for Anthem in the Dayton area from 2006 to the present.  Defendants maintain that its internal communications relating to Plaintiff should be stored in those same e-mailboxes.  Thus Anthem has already agreed to collect, search, and review the internal documents Defendants have requested and they should not be any additional cost.

The Court has afforded cost shifting to ameliorate Anthem's concerns.[9]

---

[9]  While the general rule is that the party responding to a discovery request should bear the cost, a trial court has discretion to shift the cost under Federal Rule of Civil Procedure 26(c) to protect the responding party from undue burden or expense.  *See, e.g., Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978) ("The presumption is that the responding party must bear the expense of complying with discovery requests, but he may invoke the district court's discretion under Rule 26(c) to grant orders protecting him from 'undue burden or expense' in doing so, including orders conditioning discovery on the requesting party's payment of the costs of discovery.").

### E. Plaintiff's Document Requests

Anthem has objected to production of all of the following of Plaintiff's requests.[10]

#### 1. Specifications 3, 4, 8, 9, 10[11]

These requests seek information regarding Anthem's agreements, or lack of agreements, outside the Dayton area. Plaintiff claims these are relevant documents because of Anthem's position regarding its refusal to contract with Plaintiff. Plaintiff maintains that Defendants' contract with Anthem played a role in its inability to gain access to Anthem's products and Plaintiff is thus entitled to probe whether these statements are pretexts intended to cover up the conspiracy. Plaintiff claims that Anthem's contracting behavior in Ohio -- but outside the Dayton area (and the Defendants' control) -- is probative of that issue. For example, Defendants state that part of their defense will be that "everyone" has contract language similar to that which Plaintiff challenges. Plaintiff maintains that these contracts in other parts of Ohio will reveal whether the provisions in Defendants' contracts are unique.

---

[10] Anthem generally argues that three of Plaintiff's disputed requests, Specifications 3, 4, and 12, ask for information that Anthem does not readily maintain. (Doc. 66 at 8-9). Anthem maintains that it would take hundreds of hours of individualized inquires to obtain this information. Plaintiff maintains that Anthem's poor file organization does not insulate it from searching for probative information. *See, e.g., Dunn v. Midwestern Indem.*, 88 F.R.D. 191, 198 (S.D. Ohio 1980) ("To allow a defendant whose business generates massive records to frustrate discovery, by creating an inadequate filing system and then claiming undue burden, would defeat the purpose of the discovery rules."). Of course the Court cannot require Anthem to produce something that does not exist – and particularly when the absence of documents is not necessarily a product of poor filing so much as a result occurring because Anthem does not deem it necessary to create or organize its documents in the manner Plaintiff requests.

[11] *See also* fn. 10.

The Court is not currently persuaded that discovery need reach beyond the Dayton market. Accordingly, Anthem's duty to respond shall be limited to inquiries relating to the Dayton area.

### 2.   *Specification 11*

Specification 11 seeks communications that Anthem had with other plans regarding Plaintiff which goes directly to the scope of the conspiracy. Plaintiff has agreed that Anthem can exclude documents that deal only with the handling or payment of claims.

The Court finds that communications Anthem had with other plans regarding Plaintiff is highly relevant and shall be produced at Anthem's expense.

### 3.   *Specification 12*[12]

This request seeks information about the parties' respective costs and the quality of services, and mirrors a request by the Defendants. Plaintiff seeks this information to be reciprocal and coextensive with information provided in response to Defendants' request.

The need to receive this information from the non-party Anthem is because Plaintiff's records apparently do not capture the information sought. Had Plaintiff recorded this information in the first instance, the parties would not be putting the non-party to the expense and burden of production. Accordingly, if Plaintiff desires this

---

[12] *See also* fn. 10.

information, Plaintiff shall bear one-half of Anthem's reasonable and necessary financial cost of production.

### 4. *Specification 13*

This request seeks information about comparisons of the cost of hospital services in the Dayton area (excluding documents relating only to claim payment). Plaintiff argues that this information will permit Plaintiff to probe the price (reimbursement rates) differences between what the Defendants pay Anthem versus the rest of the Dayton area hospitals with which Anthem has contracted. These differences are allegedly relevant to the Defendants' market power as well as the bona fides of the proposition that Plaintiff's exclusion from Anthem's plans permitted the Defendants to charge reduced reimbursement rates. The latter is a form of financial inducement that Plaintiff alleges Defendants used to get plans like Anthem to deny Plaintiff. (Doc. 7 at ¶ 74(a)).

The Court is persuaded that the burden upon Anthem to produce the pricing terms of its contracts with other Dayton area hospitals, and Anthem's internal communications about those contracts, is undue and that the preserved confidentiality of Anthem's contracts' pricing terms trumps the parties' desire to empty Anthem's internal communications about highly confidential business strategies. Accordingly, the parties' demand that Anthem produce the pricing terms of Anthem's contracts with other Dayton area hospitals, and Anthem's internal communications about those contracts, is denied.[13]

---

[13] *See* fn. 7.

**5.    *Specification 16***

Next, Plaintiff requests documents sufficient to show the reimbursement rates that Defendants sought during their contract negotiations with Anthem in 2004-2005. Plaintiff maintains that this request is directly relevant to Plaintiff's allegation that Defendants collectively constituted a "must have" trading partner which permitted them to compel Anthem to agree to exclude Plaintiff from Anthem's plans. (Doc. 7 at ¶ 65). The Dayton Business Journal reported in 2004 that Defendants sought a 45% increase in prices from Anthem and when Anthem refused, the Defendants withdrew from Anthem's products for a little over a year, before Anthem agreed to terms that Defendants found acceptable. Plaintiff maintains that the details of that dispute are probative of this "must have" status Defendants enjoy in the market and which contributes to their ability to implement their conspiracy.

The Court finds that Plaintiff can inquire of Defendants, and not of non-party Anthem, what the reimbursement rates were that Defendants sought during their contract negotiations with Anthem in 2004-2005. Non-party Anthem need not be burdened with a request that the adverse party can provide. Accordingly, Plaintiff's demand that Anthem be required to produce documents sufficient to show what the reimbursement rates were that Defendants sought during their contract negotiations with Anthem in 2004-2005 is denied.

### 6.    *Specification 17*

Next, Plaintiff seeks all documents concerning Anthem's decision to contract with the Dayton Heart Hospital. Dayton Heart Hospital was the only other for-profit hospital operating in the Dayton area during the relevant time period. Plaintiff alleges that Dayton Heart was the first victim of the Defendants' conspiracy. (Doc. 7 at ¶¶ 72-73). When Anthem lost the Defendants as providers as a result of the 2004-2005 dispute, Anthem signed an agreement with Dayton Heart. Plaintiff maintains that information related to the decision and its timing is probative of whether the lack of a contract with the Defendants enabled that decision by Anthem, and it is also probative of the bona fides of Anthem's statements in the Dayton Business Journal article about its standards for adding hospitals to their products.

The Court finds that the request seeks highly relevant information and does not present an undue burden upon Anthem. Accordingly, Anthem shall produce documents responsive to this request at its expense.

### F.   **Plaintiff's Incomplete Production**

#### 1.    *Specification 5*

This request seeks Anthem contracts with Plaintiff's competitors for the time period 2005 to present. Anthem will produce contracts with Plaintiff and the Defendants from 2006 to the present with the pricing terms redacted, but will not produce contracts with any other entity or the pricing terms of the Defendants' agreements. (Doc. 63, Ex. C at 2, 4). The contracts with other hospitals relate to Plaintiff's allegation that the

Defendants' agreement with Anthem was the cause of Anthem's exclusion of Plaintiff; they are also probative of Defendants' "everyone does it" defense.

The Court is persuaded that the burden upon Anthem to produce the pricing terms of its contracts with other Dayton area hospitals, and Anthem's internal communications about those contracts, is undue and that the preserved confidentiality of Anthem's contracts' pricing terms trumps the parties' desire to empty Anthem's internal communications about highly confidential business strategies. Accordingly, the parties' demand that Anthem produce the pricing terms of Anthem's contracts with other Dayton area hospitals, and Anthem's internal communications about those contracts, is denied.[14]

### 2. *Specifications 7 and 15*

Specification 7 seeks documents regarding any Anthem decision not to contract with Plaintiff. Specifically, it seeks documents relating to any agreement Anthem had with any Defendant that operated to bar Anthem from contracting with Plaintiff. Plaintiff alleges that Defendants orchestrated a group boycott that resulted in Anthem refusing to contract with Plaintiff and therefore Anthem's internal deliberations regarding Plaintiff's repeated requests for a contract are relevant and shall be produced by Anthem.

The Court finds that the request seeks highly relevant information and does not present an undue burden upon Anthem. Accordingly, Anthem shall produce documents responsive to this request at its expense.

---

[14] *See* fn. 7.

### 3. *Specification 14*

This specification seeks documents sufficient to show Anthem's policies and access standards for participation by a hospital in any Anthem product.  Plaintiff claims it is entitled to any such policy, whether confidential or public, in order to show the jury that it met all Anthem's standards but still could not get a contract.

Anthem has only agreed to produce non-confidential information.  (Doc. 63, Ex. C at 5).

Upon review, the Court determines that Anthem shall produce all publically available information reflecting Anthem's policies and access standards for participation by a hospital in any Anthem product.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons, Defendants' motion to compel (Doc. 59) and Plaintiff's motion to compel (Doc. 63) are granted in part and denied in part, as set forth above; to wit:

Anthem shall produce:

1. Anthem preserved the electronic mailboxes of the three employees responsible for hospital contracting in the Dayton area from 2006 to 2009 and shall search those e-mailboxes as well as the e-mailboxes of the two people responsible for hospital contracting in the Dayton area since 2009.  The parties shall agree on one set of search terms to be applied to the five e-mailboxes;

2. Contracts with Plaintiff and Defendants from 2006 to the present, with all pricing terms redacted;

24

3.  Communications between Anthem and Plaintiff about contracting from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above;

4.  Communications between Anthem and Plaintiff about Premier and between Anthem and Premier about Plaintiff from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above;

5.  Communications between Anthem and Kettering about a contract with Plaintiff from 2006 to the present, with the production focused on searches of the five employee e-mailboxes described above;

6.  For the period 2006 to the present, a list and summary of each product it offered in the Dayton area and a list and summary of the number of its subscribers enrolled in each product;

7.  Non-confidential documents that set forth its policies, rules, and access standards for participation in Anthem networks;

8.  Anthem's internal communications, deliberations and analyses regarding Plaintiff, including Anthem's decisions whether or not to contract with Plaintiff;

9.  Claims paid data relating to Plaintiff (at the parties' cost);

10. Anthem's policies toward physician-owned hospitals that were applicable in the Dayton area from 2006 to the present, if any;

11. Communications Anthem had with other plans regarding Plaintiff;

12. All documents concerning Anthem's decision to contract with the Dayton Health Hospital; and

13. All publically available information reflecting Anthem's policies and access standards for participation by a hospital in any Anthem product.

**IT IS SO ORDERED**.

_/s/ Timothy S. Black_

Date:  10/16/13
Timothy S. Black
United States District Judge

25