IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THE MEDICAL CENTER AT
ELIZABETH PLACE, LLC,

        Plaintiff,

        v.

PREMIER HEALTH PARTNERS,
*et al.*,

        Defendants.

:

:

:

:

:

Case No. 3:12-cv-26

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION TO
CLARIFY ISSUES FOR TRIAL (DOC. #195), WHICH THE COURT
CONSTRUES AS A MOTION FOR RECONSIDERATION OF JUDGE
TIMOTHY BLACK'S OCTOBER 6, 2016, SEALED ORDER RESOLVING
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOC. #183);
SUSTAINING DEFENDANTS' SEALED MOTION TO PRECLUDE TRIAL
OF UNPLE[D] "RIM CONSPIRACY" CLAIM (DOC. #190); SUSTAINING
DEFENDANTS' MOTION TO PRECLUDE TRIAL OF UNPLED
"PHYSICIANS" CONSPIRACY (DOC. #194); OVERRULING AS MOOT
DEFENDANTS' SEALED MOTION TO PRECLUDE LAY WITNESS
THOMAS MALLON FROM TESTIFYING ON DAMAGES (DOC. #199),
DEFENDANTS' MOTION TO EXCLUDE PREJUDGMENT INTEREST
FROM PLAINTIFF'S CALCULATION OF DAMAGES (DOC. #200),
DEFENDANTS' SEALED MOTION TO EXCLUDE TESTIMONY OF DR.
HARRY E. FRECH III ON DAMAGES (DOC. #205), DEFENDANTS'
SEALED MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S
DAMAGES EXPERT HARRY E. FRECH, III, FOR FAILURE TO COMPLY
WITH FED. R. CIV. P. 26(e) AND 26(a)(2)(B) (DOC. #201),
DEFENDANTS' SEALED MOTION TO EXCLUDE TESTIMONY
RELATING TO PREMIER'S CASH RESERVES (DOC. #202),
DEFENDANTS' SEALED MOTION TO EXCLUDE TESTIMONY ABOUT
CATHOLIC HEALTH INITIATIVES (DOC. #203), DEFENDANTS'
SEALED MOTION TO EXCLUDE TESTIMONY OF JAMES L. WATSON
(DOC. #204), DEFENDANTS' SEALED MOTION TO EXCLUDE

TESTIMONY REGARDING HEARSAY FROM NON-TESTIFYING PHYSICIANS (DOC. #206), DEFENDANTS' SEALED MOTION IN LIMINE TO EXCLUDE HEARSAY OF MANAGED CARE FACILITY REPRESENTATIVES (DOC. #208), PLAINTIFF THE MEDICAL CENTER AT ELIZABETH PLACE'S MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE OF DEFENDANTS' PURPORTED JUSTIFICATIONS FOR THEIR ANTICOMPETITIVE CONDUCT (DOC. #210), AND PLAINTIFF THE MEDICAL CENTER AT ELIZABETH PLACE'S SEALED MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE OF KETTERING HEALTH NETWORK'S NON-COMPETE PROVISIONS (DOC. #211); DISMISSING PLAINTIFF'S SHERMAN ACT CLAIM WITH PREJUDICE; JUDGMENT TO ENTER IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF; TERMINATION ENTRY

Plaintiff, The Medical Center at Elizabeth Place, LLC ("MCEP"), a 26-bed adult acute-care hospital, filed suit against Premier Health Partners, Atrium Health System, Catholic Health Initiatives, MedAmerica Health Systems Corporation, Samaritan Health Partners, and UVMC ("the Hospital Defendants" or "Defendants"), alleging a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. MCEP alleges that Defendants orchestrated a group boycott of MCEP, which cut off access to necessary managed care contracts, physicians, and funding.

This case is currently before the Court on remand following the Sixth Circuit Court of Appeals' reversal of Judge Timothy Black's decision granting summary judgment in favor of Defendants on the question of whether MCEP's claim lacks the necessary plurality of actors. *Medical Ctr. at Elizabeth Place v. Atrium Health Sys.*, 817 F.3d 934 (6th Cir. 2016).

On October 6, 2016, on remand, Judge Black issued a Sealed Order overruling several other motions for summary judgment, which he had previously overruled as moot. Doc. #183. One of the motions overruled was Defendants' Sealed Motion for Summary Judgment that the *Per Se* Rule Does Not Apply and that Plaintiff's Claim Should Be Dismissed. Doc. #132. Earlier this year, Judge Black recused himself, and this case was re-assigned to the undersigned. Doc. #186. Trial is set to begin on August 14, 2017.

Although the parties have filed numerous motions in limine, the Court must first address Defendants' Motion to Clarify Issues for Trial, Doc. #195. The Court construes this as a motion for reconsideration of that portion of Judge Black's Sealed Order Resolving Defendants' Motions for Summary Judgment, Doc. #183, that held that the *per se* rule applies to MCEP's claim. Two other pending motions also have the potential to affect the scope of claims to be tried: (1) Defendants' Sealed Motion to Preclude Trial of Unple[d] "Rim Conspiracy" Claim, Doc. #190; and (2) Defendants' Motion to Preclude Trial of Unpled "Physicians" Conspiracy, Doc. #194.

The Court held oral argument on August 2, 2017. For the reasons set forth below, the Court concludes that Judge Black's October 6, 2016, decision was clearly erroneous, because MCEP's Sherman Act claim is not subject to *per se* condemnation. Because MCEP has disavowed any reliance on a rule of reason analysis, the Court agrees with Defendants that this claim must be dismissed.

At the outset, it is important to state what this decision is about and, more importantly, what it is not. MCEP has alleged that Defendants violated Section 1 of the Sherman Act by a series of actions and threats that severely restricted MCEP's ability to compete in the marketplace, and eventually required its sale of a 49% share to the Kettering Health Network. These allegations have neither been proven nor failed of proof in court; nor will they ever be, as a result of this decision. MCEP's allegations remain just that—allegations.

This decision represents the legal equivalent of "inside baseball." It merely reflects this Court's firm opinion that MCEP's claims, contentions and allegations must be considered by a different legal standard from that which MCEP maintains is applicable and, therefore, this case must be dismissed without those claims, contentions and allegations being tested in a court of law before a duly impaneled jury. This decision should not be considered either as a failure of proof by MCEP or an exoneration of the Defendants.

## I.  Overview of Relevant Law

Antitrust laws exist to protect competition, not competitors. *Expert Masonry, Inc. v. Boone Cty.*, 440 F.3d 336, 346 (6th Cir. 2006). Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of [a] trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

Despite this very broad language, only *unreasonable* restraints are actionable. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). The unreasonableness of a restraint of trade may be proven in one of two ways. Although a handful of categories of restraints are deemed to be *per se* unreasonable, the vast majority must be assessed, on a case-by-case basis, under a more exacting "rule of reason" standard. Accordingly, the court must initially determine, as a matter of law, whether the challenged restraint is *per se* unreasonable or whether it should be evaluated under the rule of reason. *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 271 (6th Cir. 2014).

"[C]ondemnation *per se* is an unusual step, one that depends on confidence that a *whole category* of restraints is so likely to be anticompetitive that there is no point in searching for a potentially beneficial instance." *Polk Bros., Inc. v. Forest City Enter., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (emphasis added). As the Sixth Circuit explained in *Expert Masonry*, these restraints "have such a clear lack of any redeeming virtue that any restraint of that type is conclusively presumed to be unreasonable." 440 F.3d at 342 (quoting *Bailey's, Inc. v. Windsor Am., Inc.*, 948 F.2d 1018, 1027 (6th Cir. 1991)).

The plaintiff in a *per se* case need not prove the challenged restraint's effect on the market; the anticompetitive effects are implied. The plaintiff need prove only that "(1) two or more entities engaged in a conspiracy, combination, or contract;" (2) "to effect a restraint or combination prohibited *per se*;" (3) "that was

the proximate cause of the plaintiff's antitrust injury." *Expert Masonry*, 440 F.3d at 342.

"The most important *per se* categories are naked horizontal price-fixing, market allocation, and output restrictions." Group boycotts are also sometimes included in this category. *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 61 (1st Cir. 2004). The Supreme Court has cautioned, however, that "easy labels do not always supply ready answers." *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979). *See also Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001) ("The categorical descriptions of *per se* offenses are quite misleading for anyone not well versed in antitrust."). As discussed below, the fact that a challenged restraint is labeled by MCEP as a "group boycott" does not necessary mean that it is automatically subject to *per se* condemnation.

The vast majority of restraints are subject to a "rule of reason" analysis which requires a "case-by-case evaluation of their effect on competition." *Expert Masonry*, 440 F.3d at 342 (quoting *Bailey's*, 948 F.2d at 1027). This is the prevailing standard. As economic and business structures continue to become more complex, the rule of reason appears to have gained even more traction. As noted in *Khan*, courts are reluctant to adopt *per se* rules in connection with "restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." 522 U.S. at 10 (quoting *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458-459 (1986)).

The rule of reason requires the fact finder to "weigh[] all of the circumstances of a case," to determine whether the challenged restraint of trade is unreasonable. Relevant factors include information about the relevant business, the nature and history of the restraint, the justification offered by the defendant, and the existence of any anticompetitive effects flowing from the restraint. *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007).

> If the rule of reason applies, a plaintiff must first establish:
>
> (1) that the defendants contracted, combined, or conspired; (2) that the scheme produced anticompetitive effects; (3) that the restraint affected relevant product and geographic markets; (4) that the object of the scheme and the conduct resulting from it was illegal; and (5) that the scheme was a proximate cause of the plaintiff's antitrust injury.

*Expert Masonry*, 440 F.3d at 343. The burden (not of proof but of production) then shifts to the defendant to "come forward with evidence of the restraint's procompetitive effects to establish that the alleged conduct justifies the otherwise anticompetitive injuries." *Id.* If the defendant satisfies this burden of production, the burden shifts back to the plaintiff to show "that any legitimate objectives can be achieved in a substantially less restrictive manner." *Id.* (quoting *Nat'l Hockey League Players Ass'n v. Plymouth Whalers*, 325 F.3d 712, 718 (6th Cir. 2003)).

An intermediate standard of review is the "quick look" approach under the rule of reason. It is based on the premise that, if a challenged restraint has obvious anticompetitive benefits, an elaborate market analysis is not necessarily required. Competitive harm is presumed. The defendant must then come forward

with evidence of a procompetitive reason for the restraint. *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). "Where procompetitive justifications are proffered, their logic must be assessed and rejected in order to avoid reverting to full-scale rule of reason analysis." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 832 (3d Cir. 2010).[1]

There are two types of restraints of trade. Horizontal restraints involve direct competitors at the same level of the market structure, *i.e.*, two distributors or two suppliers. *Expert Masonry*, 440 F.3d at 344. They are deemed to be more threatening and may, in some cases, be subject to a *per se* analysis. *Id.* Vertical restraints involve parties "upstream or downstream of one another," a manufacturer and a supplier, for example. *Id.* Vertical restraints are almost always subject to the rule of reason. *See Leegin*, 551 U.S. at 907; *Khan*, 522 U.S. at 22.

In *Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006), the Supreme Court set forth the analytical framework for reviewing restraints of trade by a legitimate joint venture. In that case, Texaco and Shell formed a joint venture called Equilon, to consolidate their gasoline refining and marketing operations in part of the United States. The gasoline produced by Equilon was sold at the same price under the Texaco and Shell names. Service station owners alleged that the unification of gas prices under both brands was price-fixing, and was a *per se* violation of Section 1 of the Sherman Act.

---

[1] Neither party has advocated for a "quick look" approach to this case.

The Supreme Court disagreed. It noted that "this Court presumptively applies rule of reason analysis." *Id.* at 5. The Court held that it is not *per se* illegal "for a lawful, economically integrated joint venture to set the prices at which the joint venture sells its products." *Id.* at 3. "As a single entity, a joint venture, like any other firm, must have the discretion to determine the prices of the products that it sells." *Id.* at 7.

The Ninth Circuit had reached the opposite conclusion by invoking the ancillary restraints doctrine, which "governs the validity of restrictions imposed by a legitimate business collaboration, such as a . . . joint venture, on *nonventure* activities." *Id.* at 7 (emphasis added).[2] Under that doctrine, the court must determine whether the challenged restraint "is a naked restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the business association, and thus valid." *Id.* The Court concluded that the ancillary restraints doctrine has no application "where the business practice being challenged involves the core activity of the joint venture itself—namely, the pricing of the very goods produced and sold by Equilon." *Id.* at 7-8.

_____

[2]  An ancillary restraint is one that is "subordinate and collateral to a separate, legitimate transaction" and "serves to make the main transaction more effective in accomplishing its purpose." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). For example, Atlas Van Lines uses independent agents to move household goods between two points. Atlas does the advertising, finds the customers, sets the rates, chooses routes, collects revenue and pays the agents. It instituted a policy prohibiting agents from *also* contracting to handle interstate carriage on their *own*. The court held that this restraint was "ancillary" in that it enhanced the efficiency of the enterprise by eliminating the problem of the "free ride," *i.e.*, agents using Atlas's reputation, equipment, facilities and services in conducting business for their own profit.

Accordingly, under *Dagher*, a joint venture's *core* activities are subject to a rule of reason analysis. *Non-core* activities that are naked restraints on trade are *per se* unreasonable. However, if the challenged restraint is "ancillary to the legitimate and competitive purposes of the joint venture," it may be deemed valid by the factfinder under the rule of reason.

## II.    Relevant Procedural History

### A.    Allegations in Amended Complaint (Doc. #7)

Premier Health Partners ("Premier") is a not-for profit corporation formed in 1995 pursuant to a Joint Operating Agreement ("JOA") among Catholic Health Initiatives, MedAmerica Health Systems Corporation, Atrium Health System, and UVMC (the "Hospital Defendants"). Doc. #7, PageID#37. The Hospital Defendants aggregate market share of general inpatient surgical services in the relevant geographical area exceeds 55%. Premier manages many of the business functions of these four area hospitals, including negotiating managed care contracts with insurance providers ("insurers"). *Id.* at PageID#48.

MCEP is a physician-owned, 26-bed acute-care hospital, which opened in 2006. *Id.* at PageID#37. MCEP alleges that the Hospital Defendants "set out on an agreed course of concerted action which Defendants admit was designed to eliminate [MCEP] and any other specialty hospital." *Id.* at PageID#50. In furtherance of this conspiracy, the Hospital Defendants, through Premier, allegedly engaged in the following overt acts:

10

(a) coercing, compelling, co-opting or financially inducing commercial health insurers or managed care plan providers, including Anthem, UnitedHealthcare, Private Healthcare Systems, HealthSpan, Humana, Aetna, Cigna, and Medical Mutual of Ohio to refuse to permit [MCEP] full access to their respective networks;

(b) threatening punitive financial consequences to physicians who affiliated with [MCEP] and following through on punitive measures against physicians who did affiliate with [MCEP], including terminating leases that the physicians had with the Defendants for office space;

(c) offering payments to physicians who agreed not to work with or at [MCEP]; and who agreed to divest ownership in [MCEP];

(d) coercing, compelling, co-opting or financially inducing physicians affiliated with or employed by the Hospital Defendants from becoming members of [MCEP], admitting patients to [MCEP] or referring patients to physicians who treated patients at [MCEP];

(e) hiring as employees key physicians affiliated with [MCEP] who accounted for a disproportionately high number of admissions and then prohibiting them from admitting patients to [MCEP]; and

(f) coercing, compelling, co-opting or financially inducing commercial health insurers or managed care plans to provide reimbursement rates that were below market and below the rates and on different terms from what the Hospital Defendants demanded for the exact same services.

*Id.* at PageID##51-52.

Eventually, in 2009, MCEP was forced to sell a 49% interest to Kettering Health Network, the other major health care provider in the area, "in exchange for Kettering's commitment to seek managed care contracts for [MCEP] on terms comparable to hospitals in the Kettering network." *Id.* at PageID##52-53.

MCEP alleges that the Hospital Defendants conspired to reduce output in the relevant markets, including by "orchestrating group boycotts" of MCEP, and

authorized Premier to take the steps necessary to implement the conspiracy. *Id.* at PageID#54. MCEP further alleges that this conduct is not "reasonably related to or necessary for Premier's performance of any of the joint functions specified under the JOA[,]" and that the Hospital Defendants' conduct constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**B.  Sealed Order Granting Defendants' Motion for Summary Judgment as Plaintiff's Claim Lacks the Necessary Plurality of Actors (Doc. #162)**

On October 20, 2014, Judge Black issued a Sealed Order Granting Defendants' Motion for Summary Judgment as Plaintiff's Claim Lacks the Necessary Plurality of Actors. Doc. #162. He concluded that Premier controlled the operations of the Defendant Hospitals, and that Defendants operated as a single, unified economic unit incapable of conspiring, rendering their conduct outside the scope of Section 1 of the Sherman Act. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984). Judge Black also noted that, under *Dagher*, Premier is a legitimate joint venture and that "the challenged conduct in this case—managed care contracting and physician relations—is a core function of the Premier health system." Doc. #162, PageID#15932.

Given that MCEP's failure to show the necessary plurality of actors was dispositive, Judge Black overruled as moot all other pending motions for summary judgment, including Defendants' Motion for Summary Judgment that the *Per Se* Rule Does Not Apply and that Plaintiff's Claim Should Be Dismissed, Doc. #132.

## C. Appeal to Sixth Circuit

MCEP appealed, arguing that the district court erred in holding that Defendants were a single entity incapable of conspiring. According to MCEP, three separate agreements formed the "hub and spokes" conspiracy to boycott MCEP: (1) an agreement at the hub, among the Hospital Defendants; (2) an agreement at the spokes, between the Hospital Defendants and the insurers, involving "Panel Limitations" in the managed care contracts, whereby, if the insurers added other hospitals to their networks, the Hospital Defendants could terminate or renegotiate the contracts; and (3) an agreement at the rim, whereby the insurers agreed to "hold the line" in their refusal to add MCEP to their managed care networks. MCEP argued that, in granting summary judgment, the district court erred by failing to consider evidence of the "rim conspiracy" among the insurers, which would have been independently sufficient to satisfy the "plurality of actors" requirement.

MCEP further argued that the district court erred in holding that Premier's joint venture status insulated its conduct from antitrust scrutiny. According to MCEP, the district court mischaracterized the challenged conduct as "managed care contracting and physician relations" and then erroneously concluded that these were "core activities" of the joint venture.

MCEP urged the appellate court to instead view the challenged restraint as the joint negotiation and policing of provisions that prohibited the insurers from contracting with MCEP, and that operated to exclude MCEP from the marketplace. Citing *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 338-

39 (2d Cir. 2008) (Sotomayor, J., concurring in judgment), MCEP argued that, because this "group boycott" promotes no legitimate objective of the joint venture, it must be evaluated apart from the joint venture as a *per se* horizontal concerted action.

In response, Defendants argued that MCEP's "rim conspiracy" claim was untimely, and that no triable evidence supported this new theory. They noted that the Amended Complaint contains *no* allegations of a separate agreement among the insurers to "hold the line," and MCEP never amended its Complaint to assert such a claim. Defendants suggested that this is why the district court declined to address this argument.

Defendants further argued that the district court correctly concluded that Premier is a single entity for antitrust purposes. They noted that the ancillary restraint doctrine does not apply either to a single entity or to a legitimate joint venture's core activity such as the pricing of its own goods or services. Under *Dagher*, core activities of a legitimate joint venture are subject to a rule of reason analysis. Defendants also argued that, even if the ancillary restraint doctrine applied, the result would be the same, given that the rate-for-volume provisions in the managed care contracts had undisputed plausible efficiency justifications. Defendants suggested that, because MCEP had pled only a *per se* claim, but the challenged restraints were subject to a rule of reason analysis, the district court's summary judgment decision could be affirmed on this alternative basis.

On March 22, 2016, the Sixth Circuit issued an Opinion reversing the district court's order on the "plurality of actors" element, and remanding the case for further proceedings. *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934 (6th Cir. 2016). The court concluded that:

> Based on defendants' stated intent to keep plaintiff out of the Dayton market, the evidence of coercive conduct threatening both physicians and insurance companies with financial loss if they did business with plaintiff, evidence of continued actual and self-proclaimed competition among the defendant hospitals, and evidence that the defendant hospitals' business operations are not entirely unitary, we conclude that there is a genuine issue of material fact as to whether the defendant hospitals' network constitutes a single entity or concerted action among competitors for purposes of Section 1 of the Sherman Act.

*Id.* at 938.

The court's decision was specifically limited to "the element addressed by the district court," *i.e.,* whether Defendants' conduct was the result of two or more entities acting in concert or whether Defendants, based on their participation in the JOA, functioned as a single entity. *Id.* at 939. The court noted that, in determining this issue, it must look at the actual conduct of the parties to the joint venture. *Id.* at 940. In discussing the alleged boycott, the court cited to contractual provisions ("Panel Limitations"), which restricted the insurers' ability to add new hospitals to their networks. The Sixth Circuit then stated that "[n]egotiating contracts that explicitly exclude the insurers' ability to contract with other parties is anticompetitive on its face and normally serves no proper business function, a fact recognized by the district court in its first order denying the motion

to dismiss." *Id.* at 941. Evidence showed that the insurers knew of the Panel Limitations in each other's contracts, and regularly monitored each other's compliance. *Id.* at 941-42.

Notably, the Sixth Circuit did not consider whether this separate "rim" agreement among the insurers could independently satisfy the "plurality of actors" element.[3] Likewise, the Sixth Circuit made absolutely no mention of *Dagher*. Nor did it address Defendants' argument that the district court's decision could be affirmed on the alternate ground that MCEP's claim was governed by the rule of reason and not the *per se* rule.

### D. Sealed Order Resolving Defendants' Motions for Summary Judgment (Doc. #183) on Remand

When Judge Black granted summary judgment to Defendants on the "plurality of actors" element, he overruled as moot four other pending motions for summary judgment, including Defendants' Motion for Summary Judgment that the *Per Se* Rule Does Not Apply and that Plaintiff's Claim Should Be Dismissed, Doc. #132. On remand, he issued a Sealed Order overruling these previously-filed motions. Doc. #183.

In their Motion for Summary Judgment that the *Per Se* Rule Does Not Apply, Defendants noted that the Supreme Court has held that not all group boycotts are *per se* illegal. If there are plausible arguments that the challenged restraints have legitimate efficiency justifications, they are instead governed by the rule of reason.

---

[3] At oral argument, one judge pointed out that it appeared that the district court had not addressed this argument because it was untimely. Oral Arg. Tr. at 11-13.

*Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 293-94 (1985). Defendants argued that because the rate-for-volume clauses in Premier's contracts with its insurers, and the non-compete clauses in Premier's contracts with its physicians, have plausible efficiency justifications, the alleged group boycott of MCEP cannot be deemed a *per se* violation of § 1 of the Sherman Act. Citing *Dagher*, 547 U.S. at 7, Defendants also argued that, because Premier was a legitimate joint venture, and the pricing of its products and the hiring of physicians were "core activities" of the joint venture, the rule of reason applied.

Judge Black rejected these arguments. He prefaced his decision by noting that the Sixth Circuit had cited evidence of *two* discrete horizontal agreements— one among the Hospital Defendants to prevent MCEP from competing, including precluding MCEP from obtaining managed care contracts with insurers, and another among those insurers not to offer MCEP managed care contracts. He also noted that the Sixth Circuit had stated that "[n]egotiating contracts that explicitly exclude the insurers' ability to contract with other parties is anticompetitive on its face and normally serves no proper business function, a fact recognized by the district court in its first order denying the motion to dismiss." Doc. #183, PageID#16481 (citing *Medical Ctr. at Elizabeth Place*, 817 F.3d at 941).

Citing *Nynex Corporation v. Discon, Inc.*, 525 U.S. 128 (1998), and *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430 (6th Cir. 2008), Judge Black noted that group boycotts involving horizontal agreements

among direct competitors are one of the categories of restraints that courts have deemed *per se* anticompetitive.

Judge Black acknowledged that volume-based pricing, whereby a hospital is willing to accept discounted prices from an insurer in return for access to an expected volume of patients, is "prevalent in managed care contracting in the Dayton area and elsewhere across the United States." Doc. #183, PageID#16488 n.7. He also acknowledged that this "expected volume can be realized either because the insurer offers a large number of members or because the insurer limits the size of its hospital network and in that way channels its volume to fewer hospitals." *Id.* However, he found "no record evidence demonstrating the rate for volume analyses regarding any of the managed care contracts," and "no evidence that Defendants increased rates when payers successfully negotiated Panel Limitations out of their contracts." *Id.*

Judge Black rejected Defendants' argument that their joint contracting with the insurers was a legitimate joint venture activity that should be analyzed under the rule of reason. He wrote:

> [T]his argument ignores the ancillary restraint doctrine. The ancillary restraint doctrine "recognizes that a restraint that is unnecessary to achieve a joint venture's efficiency-enhancing benefits may not be justified based on those benefits. Accordingly, a challenged restraint must have a reasonable procompetitive justification, related to the efficient-enhancing purposes of the joint venture." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008). Where that nexus does not exist, the challenged restraint must be evaluated apart from the rest of the venture, *i.e.,* as horizontal concerted action. *Id.* at 339.

The Panel Limitations that Defendants jointly negotiated with payers restricted output by excluding MCEP, which payers considered a viable price competitor to Defendants. Defendants argue that the MCEP exclusion permitted them to provide price reductions.

However, the legitimacy of the "rate for volume" rationale is the subject of a genuine dispute, which precludes it from being the basis for this summary judgment argument. Even assuming the rate for volume rationale is legitimate, it is simply Defendants bribing payers in exchange for a commitment to not bring in a rival that the Defendants would have to deal with for the payer's business. Defendants have failed to [produce] evidence that their joint contracting has any efficiency-enhancing purpose to which such an agreement is necessary.

Accordingly, a jury could reasonably conclude from this evidence that the "rate for volume" language is nothing more than a provision seeking to provide cover for excluding competitors. Alternatively, a jury could find that whatever discount was given was payment for the payer's agreement to the Panel Limitation commitment and completely unrelated [to] volume-sensitive pricing.

Doc. #183, PageID##16487-90 (footnotes omitted).

According to Judge Black, "[t]he ancillary restraint doctrine requires undisputed proof (at summary judgment) that the 'non-venture' activity (the agreement to exclude a rival from the payer's network) is joint conduct that is necessary for the Defendants to achieve whatever efficiency-enhancing purpose collective negotiation brings and that there are not less restrictive alternatives." *Id.* at PageID#16489 n.8. He found that Defendants had failed to make this showing.

Judge Black summed up as follows:

As the Court previously concluded, "[o]rganizing a group boycott of MCEP does not promote any legitimate objective of the JOA or achieve any procompetitive benefits." (Doc. 37 at 12). Accordingly, since the alleged restraint bears no relationship to some procompetitive justification or legitimate function of the joint venture,

the challenged restraint must be evaluated on its own and can be *per se* illegal even if the remainder of the joint venture is lawful. *Blackburn v. Sweeney*, 53 F.3d 825, 828-29 (7th Cir. 1995) (applying *per se* rule to a provision in a law partnership dissolution agreement that restrained the territories where former partners could advertise after finding the provision to be non-ancillary to the rest of the agreement).

Accordingly, the Court finds, as a matter of law, that the appropriate standard for evaluating the challenged conduct is the *per se* rule.

*Id.* at PageID##16490-91 (footnote omitted).

## III.    Defendants' Motion to Clarify Issues for Trial  (Doc. #195)

On June 16, 2017, after this case was reassigned to the undersigned judge, Defendants filed a Motion to Clarify Issues for Trial, Doc. #195.  They maintain that Judge Black's October 6, 2016, Order, is not only ambiguous and confusing, but also clearly erroneous.  The Court construes Defendants' Motion to Clarify Issues for Trial as a motion for reconsideration of that portion of Judge Black's October 6, 2016, Sealed Order Resolving Defendants' Motions for Summary Judgment, Doc. #183, dealing with the question of whether MCEP's claim is governed by the *per se* rule or the rule of reason.

As previously noted, Judge Black found that the alleged group boycott consists of two discrete horizontal agreements—an overarching conspiracy among Defendants to prevent MCEP from competing (the "hospital conspiracy" claim), and another conspiracy, allegedly orchestrated by Defendants, among the insurers not to offer MCEP a managed care contract (the "rim conspiracy" claim).

20

Defendants maintain that Judge Black improperly conflated these two conspiracy claims, and wrongly concluded that the *per se* rule applies to both.

Defendants ask the undersigned to "disentangle" them, and to preclude trial of *both* claims because: (1) the "hospital conspiracy" claim was pled as a *per se* claim, but is governed by the rule of reason; and (2) the "rim conspiracy" claim was not pled at all.[4]  At a minimum, Defendants ask the Court to clarify that the rule of reason governs the "hospital conspiracy" claim, and that the *per se* rule applies only to the "rim conspiracy" claim.

Defendants maintain that, to the extent that Judge Black concluded that the *per se* rule governs the hospital conspiracy claim, that holding is clearly erroneous. Moreover, the Order is confusing because, even though he concludes that the *per se* rule applies, he appears to have inadvertently evaluated the hospital conspiracy claim under the rule of reason.  In addition, although the determination of which standard applies is a question of *law*, Judge Black found that a *factual dispute* concerning the *legitimacy* of the proffered procompetitive justifications for the rate-for-volume clauses precluded summary judgment on this issue.

MCEP urges the Court to summarily deny Defendants' Motion to Clarify and sanction Defendants for filing it because it ignores the "law of the case" doctrine. Given that Judge Black's decision was issued nine months ago, and trial is imminent, MCEP also argues that Defendants' motion is untimely.

---

[4]  Defendants have filed a separate motion to preclude trial of the unpled "rim conspiracy" claim.  Doc. #190.  That motion will be addressed below.

MCEP insists that there are not two separate conspiracy claims. Although the group boycott involved two types of concerted horizontal action, the Amended Complaint alleges just *one overarching conspiracy* to effectuate a group boycott against MCEP. MCEP maintains that Judge Black thoroughly analyzed the relevant issues and correctly concluded that the *per se* rule applies to the *entire overarching conspiracy*. Citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), MCEP argues that it would be inappropriate to "dismember" the hospital conspiracy from the rim conspiracy and apply different standards to each. MCEP further argues that Defendants' purported justifications for the restraints are simply not plausible and, in any event, cannot save the group boycott from *per se* condemnation.

Defendants offer very little explanation for why they waited more than eight months to seek "clarification" of Judge Black's Order. They maintain only that they were waiting on two appellate court decisions that might support their position, and were concentrating their efforts on settlement negotiations. Nevertheless, the Court questions why they could not have raised these issues much sooner than they did.

A court typically reconsiders an interlocutory order only when there is "(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson Cty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (quotation omitted). As MCEP notes, there have been no changes in the controlling law, and

there is no new evidence. The only element that has changed is the judge assigned to try this case. All of these factors weigh against reconsideration.

Nevertheless, in the view of the undersigned, Defendants have raised a very substantial question about whether MCEP's antitrust claim must be analyzed under the *per se* rule or the rule of reason. Given that MCEP has alleged only a *per se* claim, and has disavowed reliance on a rule of reason analysis, this question is both crucial and potentially dispositive. Moreover, given the importance of this case, the Court feels compelled to address and to resolve this issue before allowing the parties to embark on what is destined to be a very lengthy and expensive trial.

## A.  Law of the Case Doctrine Does Not Preclude Reconsideration

"District courts have authority both under common law and [Federal Rule of Civil Procedure] 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). *See also Am. Civil Liberties Union v. McCreary Cty.,* 607 F.3d 439, 450 (6th Cir. 2010) (noting that where the district court has not yet entered final judgment, it is "free to reconsider or reverse its decision for any reason.").

MCEP argues, however, that the "law of the case" doctrine should preclude reconsideration of Judge Black's decision. This doctrine exists to prevent relitigation of issues in a case that have already been decided. "[W]hen a court decides upon a rule of law, that decision should continue to govern the same

issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983).

The Sixth Circuit has noted that the "'law of the case' doctrine is 'directed to a court's common sense' and is not an 'inexorable command.'" *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997) (quoting *Petition of U.S. Steel Corp.*, 479 F.2d 489, 494 (6th Cir. 1973)). MCEP acknowledges that the "law of the case" doctrine is only a *prudential* consideration, but notes that the Supreme Court has held that "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule[,] courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona*, 460 U.S. at 618 n.8).

Revisiting Judge Black's decision on the applicability of the *per se* rule so soon before the trial is scheduled to begin is, needless to say, less than ideal, particularly given the massive amounts of time and money that have already been poured into this litigation. Moreover, the undersigned has the utmost personal and professional respect for Judge Black, who is a gifted jurist and a thoughtful legal scholar.

Nevertheless, the undersigned, having thoroughly reviewed the procedural history of this case and the parties' briefs on Defendants' Motion to Clarify, and

having carefully researched this extremely complicated area of the law,[5] is convinced that Judge Black's finding—that the *per se* rule applies to MCEP's Sherman Act claim—is clearly erroneous. For the reasons set forth below, the Court concludes that this is one of those "extraordinary circumstances" in which reconsideration is warranted.

## B. Internal Inconsistencies in Judge Black's Summary Judgment Opinions

The Court agrees with Defendants that several aspects of Judge Black's legal analysis are internally inconsistent and in need of clarification. As an aside, the Court notes that, in his October 20, 2014, Order, granting summary judgment to Defendants on the "plurality of actors" element, Judge Black found that Premier was a legitimate joint venture, and that the "challenged conduct—managed care contracting and physician relations—is a core function of the Premier health system." Doc. #162, PageID#15932. Under *Dagher*, 547 U.S. at 7-8, this factual finding would have *required* the conclusion that the *rule of reason* applies. Nevertheless, because that Order was limited to the question of whether MCEP could satisfy the "plurality of actors" element, and because the Sixth Circuit declined to address the question of whether MCEP's claim was governed by the *per se* rule, this apparent inconsistency is ultimately of little import.

_____

[5]  One district court has called the application of the *per se* doctrine to joint ventures "one of the darkest corners of antitrust law . . . an area that is unsettled, unclear, unwieldy and unequivocally complex." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1007 (N.D. Cal. 2008) (internal quotation omitted).

The October 6, 2016, Order, is more problematic. MCEP alleged a *per se* illegal group boycott. Defendants argued that they were entitled to summary judgment because MCEP's claim was not subject to *per se* condemnation. Quoting *Salvino*, 542 F.3d at 339 (Sotomayor, J., concurring in judgment), Judge Black noted that, under the ancillary restraint doctrine, "a restraint that is unnecessary to achieve a joint venture's efficiency-enhancing benefits may not be justified based on those benefits. Accordingly, a challenged restraint must have a reasonable procompetitive justification, related to the efficient-enhancing purposes of the joint venture." If that nexus does not exist, it "must be evaluated apart from the rest of the venture, *i.e.*, as horizontal concerted action." Doc. #183, PageID##16487-88. Judge Black ultimately concluded that orchestrating a group boycott bears no relationship to some procompetitive justification or legitimate function of the joint venture, and that the *per se* rule therefore applied. *Id.* at PageID#16490-91.

Along the way, however, he found that "the legitimacy of the 'rate for volume' rationale is *the subject of a genuine dispute*," which precluded it from being the basis for Defendants' argument that the Panel Limitations permitted them to provide price reductions. *Id.* at PageID##16488-89 (emphasis added). In a footnote, he stated that "[t]he ancillary restraint doctrine requires undisputed proof (at summary judgment) that the 'non-venture' activity (the agreement to exclude a rival from the payer's network) is joint conduct that is necessary for the Defendants to achieve whatever efficiency-enhancing purpose collective negotiation brings and that there are not less restrictive alternatives." *Id.* at

PageID#16489 n.8 (citing Federal Trade Commission, Antitrust Guidelines for Collaborations Among Competitors at 24). He found that Defendants failed to make this showing. *Id.*

This language is troubling for a number of reasons. First, it imposes an unwarranted evidentiary burden on Defendants at this stage of the litigation. As Defendants' counsel explained at oral argument on August 2, 2017, Defendants were not seeking a ruling that their conduct was *lawful*; they were simply seeking a ruling that, *as a matter of law*, the *per se* rule does not apply to MCEP's Sherman Act claim. Accordingly, as explained more fully below, to succeed on this argument, all Defendants had to do was show that the challenged restraint, *i.e.*, the Panel Limitations, was *plausibly* necessary to achieve a procompetitive objective of the joint venture. They had no duty to *prove* that there was no genuine issue of material fact concerning the *legitimacy* of the rate-for-volume rationale. Whether the restraint is actually anticompetitive in nature is a question of fact for the jury to decide in the context of a rule of reason analysis.

Second, as Defendants point out, Judge Black's factual finding, that rate-for-volume pricing is prevalent in managed care contracts throughout the United States, would appear to *require* a finding that the challenged restraints are at least *plausibly* necessary to achieve a procompetitive objective of the joint venture, and that they are related to the efficiency-enhancing purposes of the joint venture. The rule of reason would, therefore, necessarily apply.

27

Third, Judge Black's reliance on the section of the Federal Trade Commission Guidelines for Collaborations Among Competitors that he cited is puzzling. That section, Section 3.36(b), is a subsection of Section 3.3, entitled "Agreements Analyzed Under the *Rule of Reason*." (emphasis added). Had MCEP asserted a rule of reason claim, and had Defendants moved for summary judgment on that claim, this section of the Guidelines might be relevant. However, under the circumstances presented here, the evidentiary burdens allegedly imposed by this section appear to be inapplicable to the analysis.

For all of these reasons, the Court agrees that Defendants' motion seeking clarification of Judge Black's Order was warranted, despite its extreme untimeliness.

### C.    Analysis

As previously noted, the Court construes Defendants' Motion to Clarify Issues for Trial, Doc. #195, as a motion for reconsideration of Judge Black's conclusion that the restraints of trade at issue are subject to *per se* condemnation.

In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007), the Supreme Court cautioned that the *per se* rule should be applied to a challenged restraint only if a court "can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." Likewise, the Sixth Circuit has held that the *per se* rule should be applied "reluctantly and infrequently, informed by other courts' review of the same type of restraint, and

only when the rule of reason would likely justify the same result." *In re Southeastern Milk Antitrust Litig.*, 739 F.3d at 271.

Defendants maintain that, under the analytical framework for joint ventures set forth in *Dagher*, the rule of reason applies, either because the challenged restraints, *i.e.*, the Panel Limitations and non-compete clauses, are "core activities" of the joint venture, or because they are plausibly necessary to achieve a procompetitive objective of the joint venture. MCEP, on the other hand, maintains that Premier's joint venture status is immaterial. According to MCEP, because "group boycotts" are *per se* unreasonable restraints of trade, Defendants' purported procompetitive justifications are irrelevant.

For the reasons set forth below, the Court concludes that, regardless of whether the challenged restraints are analyzed as activities of a legitimate joint venture under *Dagher*, or whether they are instead characterized as a "group boycott," a category of restraints often, but not always, subject to *per se* condemnation, the rule of reason applies. In short, the challenged restraints at issue in this case do not have "such a clear lack of any redeeming virtue" that they should be "conclusively presumed to be unreasonable." *Expert Masonry*, 440 F.3d at 342 (quotation omitted). Therefore, they cannot be deemed *per se* unreasonable restraints of trade. A more thorough rule of reason analysis is required to determine whether they violate Section 1 of the Sherman Act.

## 1.    Joint Venture Analysis

In determining whether MCEP's claim is subject to the *per se* rule or the rule of reason, the Court starts with the undisputed premise that Premier Health Partners is a legitimate joint venture.  Under the Joint Operating Agreement, the Hospital Defendants are owned, controlled and operated independently.  However, their income streams are consolidated, and Premier manages many of their business functions, including the negotiation of each hospital's managed care contracts with insurers.

MCEP points out that the Premier joint venture is perhaps not as fully integrated as the joint venture at issue in *Dagher*.  In the Court's view, the degree of integration is clearly relevant to the first element of a Sherman Act claim, *i.e.*, whether there is a plurality of actors, but has little relevance to the question of whether a challenged restraint of a joint venture is subject to *per se* condemnation.  MCEP has pointed to no authority indicating that the analytical framework for joint ventures, as set forth in *Dagher*, does not apply to the circumstances presented here.

### a.  Analytical Framework

In determining whether the *per se* rule applies, it makes a difference that Premier is a joint venture.  Joint ventures are not insulated from *per se* violations of antitrust laws.  *Salvino*, 542 F.3d at 336-37 (Sotomayor, J., concurring in judgment).  However, because they "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively," their conduct is much

more likely to be judged under the rule of reason. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). "[C]ourts must be cautious in condemning a joint venture's acts of cooperation as *per se* unreasonable, for fear of punishing the very conduct that society should aim to protect." *In re ATM Antitrust Litig.*, 554 F. Supp. 2d 1003, 1011-12 (N.D. Cal. 2008).

Accordingly, "competitors engaged in joint ventures may be permitted to engage in a variety of activities that would normally be illegal under a *per se* rule when such activities are necessary to achieve the significant efficiency-enhancing purposes of the venture." *Salvino*, 542 F.3d at 337 (Sotomayor, J., concurring in judgment). *See also Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 61 (1st Cir. 2004) (noting that labels such as "group boycott" are only "minimally useful," given that "many arrangements that are literally concerted refusals to deal have potential efficiencies and are judged under the rule of reason.").

"In short, to protect the efficiency-enhancing potential of joint ventures and cooperatives, the rule of reason is the favored method of analysis for these ventures, preventing courts from intervening before a full market analysis is completed." *Salvino*, 542 F.3d at 338 (Sotomayor, J., concurring in judgment). *See also In re New Energy Corp.*, 739 F.3d 1077, 1079 (7th Cir. 2014) ("Joint ventures have the potential to improve productivity as well as the potential to affect prices; that's why in antitrust law they are analyzed under the Rule of Reason rather than a rule of per se illegality."); *Polk Bros., Inc. v. Forest City*

*Enter., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985) (holding that the rule of reason is the norm "[w]hen cooperation contributes to productivity through integration of efforts").

As previously noted, *Texaco, Inc. v. Dagher*, 547 U.S. 1 (2006), sets forth the analytical framework for reviewing restraints of trade by a legitimate joint venture. If the challenged conduct involves a "core activity" of the joint venture, such as setting prices for its own goods or services, it is subject to a rule of reason analysis. *Id.* at 7.[6] If the challenged conduct involves restrictions imposed on a "nonventure activity," the ancillary restraints doctrine comes into play, whereby the court "must determine whether the restriction is a naked restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the business association, and thus valid." *Id.*

A treatise on antitrust law explains the analysis governing "nonventure" activities as follows. The first question is "whether the restraint is of a type potentially subject to *per se* condemnation." Holmes, W. and Mangiaracina, M., *Antitrust Law Handbook* § 2:22. If not, it is analyzed under the rule of reason. If it *is* of a type potentially subject to *per se* condemnation, then the court must ask "whether the restraint is plausibly necessary to achieving a procompetitive objective of the venture." *Id.* If the restraint is plausibly necessary, the rule of reason applies. Only "if the restraint is of a *per se* character and *not* plausibly

_____

[6] Merriam-Webster defines "core" as "a basic, essential or enduring part." https://www.merriam-webster.com/dictionary/core. The Court has found no caselaw defining this term in a relevant legal context.

necessary to a legitimate joint venture objective" is application of the *per se* rule appropriate. *Id.*

As MCEP's counsel pointed out at oral argument, a defendant can almost always concoct some reason why the challenged restraint is *plausibly* necessary to achieve a procompetitive objective of the joint venture. Accordingly, bare assertions by counsel are insufficient to establish plausibility. In the view of the undersigned, a number of other factors should be considered in assessing the plausibility of a proffered justification, including the prevalence of similar restraints in the industry, the circumstances giving rise to the particular challenged restraint at issue, and a healthy dose of common sense.

The following diagram shows the proper analytical framework:

### Joint Venture Analysis

Is challenged restraint a "core activity?"

If yes, rule of reason applies.

If no, is it of a type potentially subject to per se condemnation?

If yes, is it <u>plausibly</u> necessary (ancillary) to achieving a procompetitive objective of the joint venture?*

If no, rule of reason applies.

If yes, rule of reason applies.

If no, per se rule applies.

*Whether the challenged restraint is <u>actually</u> necessary to achieve a procompetitive objective of the joint venture is a question of fact to be decided by the jury.

Using this analytical framework, the Court then turns to the question of whether the challenged restraints at issue are subject to the *per se* rule or the rule of reason.

### b. Rate-for-Volume Pricing/Panel Limitations in Contracts with Insurers

MCEP's claim focuses on certain provisions contained in the contracts between the Defendant Hospitals and the insurers. As Judge Black explained in his October 6, 2016, Sealed Order, the price at which a hospital sells its services to an insurer is often linked to the volume of patients that the insurer can be expected to direct to that hospital over the course of the contract. This rate-for-volume pricing is "prevalent in managed care contracting in the Dayton area and elsewhere across the United States." Doc. #183, PageID#16488 n.7. MCEP conceded at oral argument that, as a general matter, no court has held rate-for-volume pricing to be *per se* illegal.

The problem, according to MCEP, is how Defendants went about obtaining the benefit of their bargain. Given that it is the physicians who decide where to refer their patients, an insurer has no way to *guarantee* a certain volume of patients; however, as explained at oral argument, the expected volume can be *estimated* based on past hospital admissions. Judge Black noted that the expected volume can be realized "either because the insurer offers a large number of members or because the insurer limits the size of its hospital network and in that way channels its volume to fewer hospitals." *Id.*

The managed care contracts that Premier negotiated on the behalf of the individual hospitals contain a "Panel Limitations" clause, which is the chief challenged restraint at issue. It does not expressly prohibit the insurer from adding other hospitals to its managed care networks. Rather, it provides that, if the insurer *does* add other hospitals to the network, thereby diluting the expected volume, the hospital has the option to terminate the contract or renegotiate the rates at which it will sell the services at issue.

MCEP acknowledges that these Panel Limitations are vertical restraints (between parties "upstream or downstream" of each other), which are typically analyzed under a rule of reason. Citing *Com-Tel, Inc. v. DuKane Corp.*, 669 F.2d 404, 409 (6th Cir. 1982), MCEP nevertheless argues that the *per se* rule applies because Defendants enforced the Panel Limitations in a way that prevented MCEP, a *horizontal* competitor, from obtaining crucial managed care contracts. In other words, according to MCEP, the Panel Limitations operated to exclude MCEP from the market, thereby rendering a *per se* analysis appropriate.

In *Business Electronics Corporation v. Sharp Electronics Corporation*, 485 U.S. 717 (1988), the Supreme Court appears to have rejected this view. It stated that "a restraint is horizontal not because it has horizontal effects, but because it is the product of a horizontal agreement." *Id.* at 730 n.4. *See also In re Southeastern Milk Antitrust Litig.*, 739 F.3d at 273 ("The conspiracy's effect on the plaintiff, however, is not the sole means of determining whether a restraint is horizontal or vertical. The agreement which causes the effect is determinative.").

35

It would appear, therefore, that the Panel Limitations are vertical restraints subject to the rule of reason.

Nevertheless, assuming *arguendo* that *DuKane* is still good law, and that the Panel Limitations could be deemed *per se* unreasonable based on their *effect* on MCEP, a horizontal competitor of Defendants, the Court will proceed to analyze them under the analytical framework of *Dagher*. The result is the same.

The first question is whether the Panel Limitations involve a "core activity" of the joint venture. *Dagher* held that the pricing of the very goods or services produced by a joint venture is a core activity subject to the rule of reason. 547 U.S. at 7-8. To the extent that the Panel Limitations operate to ensure a certain volume of patients, and that volume, in turn, forms the basis of the discounted prices offered to the insurer, the Panel Limitations are intricately intertwined with "internal pricing decisions," which were found to be core activities in *Dagher*.[7] Accordingly, the rule of reason applies.

However, even if the Panel Limitations are viewed as "nonventure" restraints, based on the fact that they reach outside of the joint venture to impose potential negative consequences on insurers who decide to add new hospitals to their managed care networks, the rule of reason still applies.

_____

[7]  Notably, in the course of deciding that MCEP's claim lacked the necessary plurality of actors, Judge Black found that the challenged restraints, "managed care contracting and physician relations," were "core functions" of the joint venture under *Dagher*. Doc. #162, PageID#15932. The Sixth Circuit did not disturb this finding on appeal.

As explained above, the next question would be whether the Panel Limitations are a naked restraint of a type typically subject to *per se* analysis. If they are not, the rule of reason applies. If they are, the Court must ask whether they are plausibly necessary to achieve a procompetitive objective of the joint venture.

On appeal, the Sixth Circuit stated, "[n]egotiating contracts that explicitly exclude the insurers' ability to contract with other parties is anticompetitive on its face and normally serves no proper business function, a fact recognized by the district court in its first order denying the motion to dismiss." *Medical Ctr. at Elizabeth Place v. Atrium Health Sys.*, 817 F.3d at 941. Pointing to this statement, MCEP argues that the Sixth Circuit definitively held that this claim is subject to the *per se* rule.[8] This Court disagrees for several reasons.

First, the Sixth Circuit explicitly stated that "[t]his appeal looks *only* at the element addressed by the district court, which is the first element: whether defendants' conduct is the result of two or more entities acting in concert or whether defendants, based on their participation in the joint operating agreement,

_____

[8]  MCEP also argues that, because Defendants also argued on appeal—as an alternate ground for affirming Judge Black's opinion—that MCEP's claim was not subject to the *per se* rule, and because the Sixth Circuit did not discuss this alternate ground for affirmance, we should assume that the Sixth Circuit impliedly rejected it. Given the Sixth Circuit's explicit statement that the appeal concerned only the *first* element of the Sherman Act claim, *i.e.*, plurality of actors, such an inference is unwarranted. Moreover, the Sixth Circuit was not required to address the alternate ground for affirmance. *See Portman v. Cty. of Santa Clara*, 995 F.2d 898, 910 (9th Cir. 1993) ("Although we may affirm the grant of summary judgment on any basis presented in the record, we are not obliged to do so.").

function as a single entity in the market place." *Id.* at 939 (emphasis added). Because the question of whether the Panel Limitations provision is a *per se* unreasonable restraint of trade is completely irrelevant to the first element of the claim, the Sixth Circuit's statement, that "[n]egotiating contracts that explicitly exclude the insurers' ability to contract with other parties is anticompetitive on its face and normally serves no proper business function," is nothing more than dicta.

Second, it is based on the false premise that Premier's contracts explicitly prohibited the insurers from adding other hospitals to the network. As discussed above, that was not the case. Although the insurers may face adverse financial consequences if they did so, they were not prohibited from adding other hospitals to the network.

Third, as counsel for Defendants pointed out at oral argument, courts have repeatedly rejected antitrust challenges to short-term exclusive contracts between insurers and hospitals. *See, e.g., Methodist Health Services Corp. v. OSF Healthcare Sys.*, 859 F.3d 408, 410 (7th Cir. 2017) (noting that "an insurance company may get better rates from a hospital in exchange for agreeing to an exclusive contract, as exclusivity will drive a higher volume of business to the hospital."). Accordingly, the Sixth Circuit's statement that such provisions are anticompetitive on their face does not appear to comport with the law.[9]

---

[9]  The Court notes that the Sixth Circuit did qualify its statement by saying that such restraints "*normally* serve[] no proper business function." 817 F.3d at 939 (emphasis added).

Based on the foregoing, in this Court's view, the Panel Limitations are not a naked restraint of the type typically subject to *per se* analysis. The rule of reason would therefore apply. Assuming *arguendo* that the Panel Limitations are, in fact, of a type typically subject to a *per se* analysis (as the Sixth Circuit appeared to state), the result would be the same. The question would then become whether the Panel Limitations are plausibly necessary to achieve a procompetitive objective of the joint venture. If they are not plausibly necessary, they are subject to *per se* condemnation. Otherwise, they are subject to the rule of reason.

Judge Black found that there was no evidence that the hospitals increased their rates after the Panel Limitations were removed from the contracts. At this stage, however, the only question is whether the Panel Limitations were *plausibly* necessary to achieve a procompetitive objective of the joint venture at the time the agreement was made. *Polk Bros.,* 776 F.2d at 189. They clearly were.

The Panel Limitations help ensure that patient volume at the hospitals remains steady. This is the *quid pro quo* for the discounted rates that the hospitals offer the insurers, and the only real way that the hospitals can protect the benefit of their bargain. In turn, the discounted rates given to the insurers arguably will result in lower premiums and more choices for the consumers. *See Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1261 (10th Cir. 2006) (noting that "there is substantial empirical evidence that selective contracting allows managed care companies to contain health care costs—the more restrictive the panel, the lower the cost of the premium to the subscriber."). Given that

Defendants have presented *plausible* efficiency justifications for the Panel Limitations, related to the efficiency-enhancing purposes of the joint venture, the rule of reason applies as a matter of law.

Defendants have no evidentiary burden at this stage to prove that the Panel Limitations were, in fact, necessary to achieve a procompetitive purpose. After reviewing all of the evidence in this case, a jury could ultimately conclude that the Panel Limitations are an unreasonable restraint of trade, and that Defendants used the Panel Limitations in an anticompetitive manner to exclude MCEP from the market. However, because the Panel Limitations are plausibly necessary to achieve a procompetitive objective of the joint venture, this finding must be made only after considering all relevant factors under a full rule of reason analysis. The Panel Limitations are not subject to *per se* condemnation.

### c. Non-Compete Clauses

MCEP also challenges Defendants' enforcement of certain non-compete provisions in leases and employment contracts of physicians who invested in MCEP, who were affiliated with MCEP, or who referred patients to MCEP. Again, because these are purely vertical restraints (between the employer and employee), the Court believes that the *per se* rule does not apply, regardless of any negative effects on MCEP. *Business Elec. Corp.*, 485 U.S. at 730 n.4. Nevertheless, the Court will analyze the non-compete provisions under *Dagher*.

Defendants argue that because physicians are necessary to the operation of the joint venture, the non-compete provisions included in the employment

contracts and leases should be deemed core activities subject to the rule of reason. The Court tends to agree. But even if the non-compete provisions are deemed "non-core," the result is the same, because they are not of a type typically subject to *per se* analysis and, even if they were, they are plausibly necessary to achieve a procompetitive objective of the joint venture. The non-compete provisions arguably operate to make the joint venture agreement more productive. The hospitals provide training to the physicians and provide nearby office space in order to increase patient volume. They do not want the physicians to reap the benefits of the training and the convenient office space, and then refer their patients elsewhere or invest in other hospitals.

Accordingly, under the framework set forth in *Dagher*, the rule of reason applies to the non-compete provisions also. Again, after considering all of the evidence, a jury might reject Defendants' arguments, but because there are plausible procompetitive justifications for the non-compete provisions, the challenged restraints must be subjected to a full rule of reason analysis.

### 2. Group Boycott Analysis

MCEP argues that Defendants' status as a joint venture is immaterial where a horizontal group boycott is alleged. According to MCEP, because group boycotts are *per se* unreasonable restraints on trade, it is improper to consider whether the challenged restraints are plausibly necessary to achieve some procompetitive objective of the joint venture. The Court disagrees.

Even though a restraint of trade may fall into one of the categories traditionally labeled *per se* unreasonable, this does not mean that it is *per se* unreasonable in the context of a joint venture. As one court explained, "well-settled doctrines of antitrust law do not always map smoothly onto the relatively contemporary concept of joint ventures. It is not appropriate to assume that a restraint imposed by members of a joint venture is *per se* unreasonable, merely because the same conduct by competitors would be judged under the *per se* rule." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d at 1011. *See also In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1013 (7th Cir. 2012) (holding that, even though price fixing is *per se* illegal, it may be subject to rule of reason analysis in the context of a legitimate joint venture).

Moreover, it is true that group boycotts have often been included on the list of "classes of economic activity that merit *per se* invalidation under § 1 [of the Sherman Act]." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 293 (1985). Nevertheless, "[t]here is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." *Id.* at 294 (quoting L. Sullivan, Law of Antitrust 229-230 (1977)).

In earlier antitrust cases, such as *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), the Supreme Court stated that group boycotts have traditionally fallen into the "forbidden category" and "have not been saved by allegations that they were reasonable in the specific circumstances." *Id.* at 212.

42

Although the law has evolved, and group boycotts are no longer considered automatically subject to the *per se* rule, courts have continued to cite *Klor's* and other early cases for that outdated proposition. *See, e.g., Com-Tel, Inc. v. DuKane*, 669 F.2d 404, 408 (6th Cir. 1982) (citing *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958) for the proposition that group boycotts are *per se* illegal); *Expert Masonry*, 440 F.3d at 344 (citing *Fashion Originators' Guild v. Federal Trade Comm'n*, 312 U.S. 457 (1941) for the proposition that group boycotts are typically viewed under the *per se* rule "regardless of any alleged ameliorative rationale.").

In *Northwest Wholesale Stationers*, the Supreme Court clarified that "not all concerted refusals to deal [*i.e.*, group boycotts] are predominately anticompetitive." 472 U.S. at 298. It identified three characteristics of the kinds of group boycotts that have been deemed *per se* illegal. First, they involve joint efforts to disadvantage competitors by cutting off access to necessary suppliers or customers. *Id.* at 294. Second, the defendants typically possess a "dominant position in the relevant market." *Id.* Third, "the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Id.* When these factors are present, "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote." *Id.*

The Court went on to say that "a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment." *Id.* at 295.

Nevertheless, *Northwest Wholesale Stationers* instructs that, although the presence of a plausible procompetitive justification may not be dispositive, it certainly cannot be ignored in determining whether *per se* condemnation is warranted.

One treatise states that if the alleged group boycott arguably serves a plausible procompetitive objective, "then the analysis shifts to a full rule of reason inquiry." Holmes, W. and Mangiaracina, M., Antitrust Law Handbook, § 2:16. *See also Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003) ("When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, *per se* treatment is inappropriate, and the rule of reason applies.").

In this case, assuming *arguendo* that the alleged group boycott involved efforts to disadvantage MCEP by cutting off access to necessary managed care contracts, physicians and/or investors, and assuming *arguendo* that Premier possesses a "dominant position in the relevant market," the Court—for the reasons set forth above—finds that the challenged restraints at issue (Panel Limitations and non-compete provisions) were nevertheless plausibly "intended to enhance overall efficiency and make markets more competitive." *Northwest Wholesale Stationers*, 472 U.S. at 294. The alleged group boycott is therefore not subject to *per se* condemnation.

The case of *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57 (1st Cir. 2004), is closely analogous to this one. Blue Cross, in exchange

for better prices, entered into a three-year exclusive contract with certain

pharmacies, creating a "closed network." A few other pharmacies were later

allowed to join the network, but Stop & Shop and Walgreen were excluded. They

sued, alleging antitrust violations.

The district court dismissed their *per se* claims, and the First Circuit

affirmed. The court held that "the closed network is simply an exclusive dealing

arrangement which is not a *per se* violation of the antitrust laws." *Id.* at 62 (citing

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-29 (1961)). "Because

such agreements can achieve legitimate economic benefits (reduced cost, stable

long-term supply, predictable prices), no presumption against such agreements

exists *today*." *Id.* at 65 (emphasis added).

As to the fact that the contract precluded the network from admitting any

other new pharmacies, the court concluded that:

> this is a possible antitrust violation, but it is not a *per se* violation. The
> reason is that the closed pharmacy arrangement is valuable to
> participating pharmacies in part because it directs volume to them;
> thus, the United/Provider pharmacies had a direct interest, in
> exchange for allowing CVS to compete for their captive subscribers,
> in not only being allowed to compete for Blue Cross' customers but in
> making sure that yet additional new member pharmacies did not
> unreasonably dilute this benefit.
>
> This does not mean that the ancillary restriction is lawful[,] but only
> that *per se* condemnation is not appropriate. Joint ventures involving
> direct competitors not infrequently exclude other competitors. *Cf.*
> *N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472
> U.S. 284, 296–97, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

*Id.* at 63.

Likewise, in *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1550-51 (11th Cir. 1996), the Eleventh Circuit held that an agreement to exclude certain providers from a multiprovider network is subject to the rule of reason, and that panel limitations do not constitute a *per se* illegal group boycott.

The Court finds the reasoning in these cases to be very persuasive. Defendants' alleged attempts to exclude MCEP from the market by cutting off access to insurers, physicians and investors may well constitute an antitrust violation. In fact, on appeal of this case, the Sixth Circuit noted that "[t]he summary judgment record leaves little doubt on the question of the intent of the network to prevent plaintiff hospital from entering the Dayton healthcare market." *Med. Ctr. at Elizabeth Place*, 817 F.3d at 937-38. Nevertheless, Defendants' stated intent is not enough to bring the challenged restraints within the *per se* rule. *See Nynex,* 525 U.S. at 137-38 (holding that a stated motive to drive a competitor from the market does not necessarily lead to a finding that this was a *per se* illegal "boycott"). Given the facts presented here, MCEP's claim is subject to the rule of reason.

There is yet another reason why the Court believes that MCEP's claim is subject to a rule of reason analysis. The fact that the case involves rate-for-volume pricing and non-compete provisions that are commonplace in the health care industry, many of which existed in Defendants' contracts long before MCEP came into existence, leads the Court to conclude that these are not the types of restraints that lack such redeeming value that they should categorically be subject

to *per se* condemnation. In addition, because courts do not have a great deal of experience in the complex area of managed care contracting, it is inappropriate to condemn such practices as *per se* violations of the Sherman Act. *See, e.g., Diaz v. Farley*, 215 F.3d 1175, 1184 (10th Cir. 2000) (holding that the relative inexperience of courts in understanding internal hospital scheduling practices made it "wholly inappropriate to justify condemning one type of scheduling practice as *per se* violative of the Sherman Act"); *Cohlmia v. Ardent Health Servs., LLC*, 448 F. Supp. 2d 1253, 1267 (N.D. Okla. 2006).

### 3. Conclusion

MCEP has pled only a *per se* violation of Section 1 of the Sherman Act. For the reasons set forth above, the Court concludes that Judge Black's conclusion that the *per se* rule applies to MCEP's claim is clearly erroneous. Regardless of whether the challenged restraints are analyzed as activities of a joint venture under *Dagher*, or completely outside of the joint venture, as a horizontal agreement to exclude MCEP from the marketplace, *i.e.*, a group boycott, the result is the same.

Under the circumstances presented here, the Court cannot say that the challenged restraints are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher*, 547 U.S. at 5 (quoting *National Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978)). Accordingly, the rule of reason applies, and MCEP's claim must be dismissed.

The Third Circuit has noted that:

While pleading exclusively *per se* violations can lighten a plaintiff's litigation burdens, it is not a riskless strategy. If the court determines that the restraint at issue is sufficiently different from the *per se* archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed. *E.g., AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006); *see also Texaco v. Dagher*, 547 U.S. 1, 7 n.2, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006) (declining to conduct a rule of reason analysis where plaintiffs "ha[d] not put forth a rule of reason claim"). *See generally* 11 Hovenkamp, *supra*, ¶1910b (discussing the cost-benefit analysis involved in deciding whether to pursue an exclusively *per se* theory of liability).

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010). *See also Diaz*, 215 F.3d at 1182 (where plaintiffs conceded that they did not have sufficient evidence to support a rule of reason claim, and the appellate court agreed that the *per se* rule was inapplicable, the district court's order dismissing the antitrust claim must be affirmed). Given that MCEP has disavowed any reliance on a rule of reason analysis, and its claim is not subject to *per se* condemnation or analysis under a *per se* standard, the Court DISMISSES MCEP's Sherman Act claim WITH PREJUDICE.


IV.    **Defendants' Motions to Preclude Trial of Unpled Conspiracy Claims (Docs. #190, 194)**

MCEP has alluded to three separate "agreements" in this case: (1) an agreement among the Hospital Defendants to exclude MCEP from the market place (what Defendants call the "hospital conspiracy"); (2) an agreement among the insurers not to offer MCEP a managed care contract (what Defendants call the "rim conspiracy"); and (3) an agreement among Defendants' primary care physicians

and independent primary care physicians not to do business with investors in MCEP (what Defendants call the "physicians conspiracy").

The Amended Complaint alleges only an agreement among the Hospital Defendants. Defendants have moved to preclude trial of the other two "unpled conspiracies." Docs. ##190, 194. The Court's finding, that MCEP's Sherman Act claim is not subject to *per se* condemnation and must be dismissed, would appear to render these motions moot. Nevertheless, in an abundance of caution, the Court will briefly address them.

MCEP has never moved to amend its Complaint to assert allegations of separate agreements among the insurers, or among the physicians.[10] At oral argument and in their reply brief, however, Defendants conceded that, if MCEP could prove that the insurers agreed among themselves not to offer MCEP a managed care contract and that Premier orchestrated that agreement, the *per se* rule would apply to that claim. Doc. #236, PageID#20286. The same could presumably be true of the alleged agreement among primary care physicians employed by Premier and independent primary care physicians.

To the extent that MCEP could argue that, instead of dismissing the Sherman Act claim on the ground that the *per se* rule does not apply to the "hospital conspiracy," as pled, the Court should allow MCEP to amend its

---

[10] MCEP maintains that these are not separate claims, but are merely "additional evidence" of the overarching conspiracy claim pled in the Amended Complaint. Given that the Amended Complaint already names all of the relevant parties as coconspirators, MCEP contends that no amendment was needed.

Complaint to assert these previously-unpled allegations, the Court rejects this suggestion.

### A. Defendants' Sealed Motion to Preclude Trial of Unple[d] "Rim Conspiracy" Claim (Doc. #190)

Defendants filed a Sealed Motion to Preclude Trial of Unple[d] "Rim Conspiracy" Claim, Doc. #190. Although the Amended Complaint alleges that Defendants "orchestrated group boycotts," and that they coerced insurers into refusing to offer managed care contracts to MCEP, it contains no allegation that the *insurers* ever agreed *with each other* not to offer managed care contracts to MCEP. Moreover, MCEP has never sought leave to amend its Complaint to assert such a claim.

According to Defendants, the possibility of a "rim conspiracy" among the insurers was first mentioned by MCEP's attorney during Dr. David Argue's deposition on June 10, 2014, well after the discovery deadline, and after expert reports had been exchanged. Doc. #190-2, PageID##16589-90. Discovery had allegedly revealed evidence that the insurers were aware of the panel restrictions in each other's contracts with Defendants, had agreed to "hold the line" in their refusal to offer MCEP managed care contracts, and had monitored each other's commitments to this agreement. MCEP later raised allegations of a "rim conspiracy" in its memorandum in opposition to Defendants' motions for summary judgment, Doc. #139, and again on appeal.

Defendants note that MCEP raised this new claim only *after* they moved for summary judgment on the question of whether MCEP could establish the "plurality of actors" element of its Sherman Act claim—MCEP asserting that, even if the Hospital Defendants could not satisfy this element because they were a "single entity," a conspiracy *among the insurers* could.

Defendants objected to this "newly-minted" claim. They surmise that the district court agreed that the "rim conspiracy" claim was untimely; after all, its decision granting summary judgment in Defendants' favor on the plurality element makes sense only if the court deemed the new rim conspiracy claim to be improper. Likewise, although MCEP raised the issue on appeal, and the Sixth Circuit mentioned the alleged agreement among the insurers in its opinion, the appellate court did not conduct any separate analysis of the "rim conspiracy" claim. Oral argument transcripts indicate that at least one judge believed that this claim was untimely, and that MCEP should have sought leave to amend the Complaint. Oral Arg. Tr. at 11-13.

Given that a "rim conspiracy" claim was not pled in the Amended Complaint, Defendants conducted no discovery on the relationships *among the insurers*, and sought no expert witness opinions on this topic. They argue that they would, therefore, be severely prejudiced if the Court now allowed MCEP to pursue this claim. Doc. #190-1, PageID##16579-85. *See Super Sulky, Inc. v. United States Trotting Ass'n*, 174 F.3d 733 (6th Cir. 1999) (refusing to allow trial of new

conspiracy claim raised for the first time in opposition to summary judgment motion).

Defendants further note that a claim based on a horizontal agreement among the Hospital Defendants would be analyzed very differently than a claim based on a horizontal agreement among the insurers. Because the Hospital Defendants have entered into a joint operating agreement, the key question, the factual dispute, is whether Premier constitutes a single entity incapable of conspiring, or whether the individual hospitals should be viewed as separate actors.

In contrast, there is no question that the insurers are separate entities. The focus there is on whether the insurers actually agreed among themselves and with Premier to exclude MCEP from the marketplace. Proof of such a claim would focus on factors set forth in *Re/Max International, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999):

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether the defendants have been uniform in their actions; (3) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether the defendants have a common motive to conspire.

*Id.* at 1009.

At oral argument, counsel for Defendants estimated that, if the Court were to allow MCEP to amend its Complaint to assert a "rim conspiracy" claim, Defendants would need 12-18 months of additional fact discovery, followed by new expert witness opinions and new dispositive motions. Given that this

litigation was initiated more than five years ago and substantial resources have already been expended, he argued that Defendants would be severely prejudiced if the Court permitted such an amendment. MCEP counters that Defendants' claims of prejudice are spurious, given that Defendants passed up numerous opportunities to seek discovery on this topic.

The Court agrees with Defendants that the "rim conspiracy" is a separate claim not encompassed within the allegations of the conspiracy alleged in the Amended Complaint. MCEP has unsuccessfully tried to wedge this new claim into the existing allegations. If MCEP wanted to pursue a claim based on this separate agreement among the insurers, orchestrated by the Defendants, it should have moved to amend the Complaint. Given that the evidence needed to defend against a "rim conspiracy" claim is significantly different than what is needed to defend against the claim that was actually pled, the Court agrees that Defendants would be severely prejudiced if MCEP were permitted to amend its Complaint at this late date. The Court therefore SUSTAINS Defendants' Sealed Motion to Preclude Trial of Unple[d] "Rim Conspiracy" Claim, Doc. #190.

### B. Defendants' Motion to Preclude Trial of Unpled "Physicians" Conspiracy (Doc. #194)

Defendants have also moved to preclude MCEP from pursuing at trial, or introducing any evidence of a purported "agreement among Defendants' primary care physicians and independent primary care physicians not to do business with investors in [MCEP]." Doc. #194. This allegation of yet a *third* horizontal

agreement was not brought to Defendants' attention until May 26, 2017, when they received MCEP's draft of the Proposed Final Pretrial Order. Unlike the "rim conspiracy" claim, it was not raised in response to the motions for summary judgment or on appeal.

As before, MCEP denies that this is a separate claim or a new theory. MCEP again tries to wedge this new agreement into the Amended Complaint, citing allegations that the Hospital Defendants coerced doctors not to affiliate with MCEP or refer their patients to physicians who treated patients at MCEP. The Amended Complaint, however, contains no allegation of a separate agreement *among the physicians*. If MCEP wanted to rely on this purported agreement, it needed to amend its Complaint.

Defendants have not had the opportunity to conduct discovery, seek expert witness testimony, or move for summary judgment on this claim. Doc. #194-1. As such, allowing MCEP to present evidence of a separate agreement among the physicians would be unfairly prejudicial to Defendants. The Court therefore SUSTAINS Defendants' Motion to Preclude Trial of Unpled "Physicians" Conspiracy, Doc. #194.

## V. Conclusion

For the reasons stated above, Defendants' Motion to Clarify Issues for Trial, Doc. #195, which the Court construes as a motion for reconsideration of Judge Black's October 6, 2016, Sealed Order Resolving Defendants' Motions for

Summary Judgment, Doc. #183, is SUSTAINED. The Court finds that Judge

Black's conclusion that MCEP's Sherman Act claim is governed by the *per se* rule

is clearly erroneous. Given that MCEP has pled only a *per se* claim, but the rule of

reason applies, the Court DISMISSES MCEP's Sherman Act claim WITH

PREJUDICE.

The Court also SUSTAINS Defendants' Sealed Motion to Preclude Trial of

Unple[d] "Rim Conspiracy" Claim, Doc. #190, and Defendants' Motion to Preclude

Trial of Unpled "Physicians" Conspiracy, Doc. #194.

The following other motions in limine are OVERRULED AS MOOT:

- Defendants' Sealed Motion to Preclude Lay Witness Thomas Mallon from Testifying on Damages (Doc. #199);
- Defendants' Motion to Exclude Prejudgment Interest from Plaintiff's Calculation of Damages (Doc. #200);
- Defendants' Sealed Motion to Exclude Testimony of Dr. Harry E. Frech III on Damages (Doc. #205);
- Defendants' Sealed Motion to Exclude Opinions of Plaintiff's Damages Expert Harry E. Frech, III, for Failure to Comply with Fed. R. Civ. P. 26(e) and 26(a)(2)(B) (Doc. #201);
- Defendants' Sealed Motion to Exclude Testimony Relating to Premier's Cash Reserves (Doc. #202);
- Defendants' Sealed Motion to Exclude Testimony about Catholic Health Initiatives (Doc. #203);
- Defendants' Sealed Motion to Exclude Testimony of James L. Watson (Doc. #204);
- Defendants' Sealed Motion to Exclude Testimony Regarding Hearsay from Non-Testifying Physicians (Doc. #206);
- Defendants' Sealed Motion In Limine to Exclude Hearsay of Managed Care Facility Representatives (Doc. #208);
- Plaintiff The Medical Center at Elizabeth Place's Motion in Limine No. 1 to Exclude Evidence of Defendants' Purported Justifications for Their Anticompetitive Conduct (Doc. #210); and
- Plaintiff The Medical Center at Elizabeth Place's Sealed Motion in Limine No. 2 to Exclude Evidence of Kettering Health Network's Non-Compete Provisions (Doc. #211).

Judgment shall enter in favor of Defendants and against Plaintiff.

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: August 9, 2017

WALTER H. RICE
UNITED STATES DISTRICT JUDGE